**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

CASE NO. *14CV80931 COHN/SELTZER*

FILED by _____ D.C.

**JUL 1 4 2014**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

CONSUMER FINANCIAL PROTECTION
BUREAU and THE STATE OF FLORIDA,
Office of the Attorney General,
Department of Legal Affairs,

        Plaintiffs,

v.

MICHAEL HARPER, an individual; BENN
WILLCOX, an individual; MARC HOFFMAN,
an individual; THE HOFFMAN LAW GROUP,
P.A. f/k/a THE RESIDENTIAL LITIGATION
GROUP, P.A., a Florida corporation;
NATIONWIDE MANAGEMENT SOLUTIONS,
LLC, a Florida limited liability company;
LEGAL INTAKE SOLUTIONS, LLC, a Florida
limited liability company; FILE INTAKE
SOLUTIONS, LLC, a Florida limited liability
company; and BM MARKETING GROUP,
LLC, a Florida limited liability company,

        Defendants.

**PLAINTIFFS' *EX PARTE* MOTION FOR *EX PARTE***
**TEMPORARY RESTRAINING ORDER WITH**
**ASSET FREEZE AND OTHER EQUITABLE RELIEF**
**AND ORDER TO SHOW CAUSE WHY A PRELIMINARY**
**INJUNCTION SHOULD NOT ISSUE**
**AND MEMORANDUM IN SUPPORT THEREOF**

**(FILED UNDER TEMPORARY SEAL) [1]**

---

[1] Motion to Seal filed concurrently.

## I. INTRODUCTION

Since April 2012, an enterprise operating in the name of the Hoffman Law Group (the "HLG Enterprise") has accepted millions of dollars in illegal upfront fees by selling consumers spots as plaintiffs in sham mass-joinder lawsuits, falsely promising those consumers that the lawsuits will induce banks to give the consumers mortgage modifications or foreclosure relief. In reality, the HLG Enterprise is nothing more than a foreclosure rescue/mortgage assistance scam set up to take homeowners' money upfront and perform little if any of the services promised. The Consumer Financial Protection Bureau, the federal agency established by Congress to protect American consumers from financial sector misconduct, together with the State of Florida, through its Attorney General, asks this Court to halt the HLG Enterprise's ongoing, nationwide mortgage assistance relief scam.

Run by veterans of loan modification schemes, the HLG Enterprise preys on distressed homeowners by failing to provide promised relief from unaffordable mortgage payments and foreclosure. Despite taking illegal advance fees, the HLG Enterprise ultimately provides little or no meaningful assistance to struggling homeowners. Instead, they usually exacerbate consumers' problems—sometimes pushing them into foreclosure or bankruptcy—while pocketing astonishing profits.

In an attempt to circumvent federal consumer financial law and take advantage of regulatory exemptions for the practice of law, the HLG Enterprise holds itself out as a law firm and promises legal representation. Defendants use deceptive advertising and telemarketing to recruit consumers to join mass-joinder lawsuits, leading consumers to believe that joining these lawsuits will stay foreclosures, reduce their loan balances and interest rates, and entitle them to money damages. After they gain consumers' trust, Defendants then charge consumers thousands of dollars each upfront, before any service is provided.  After the money is received and while continuing to collect additional fees from the clients, the HLG Enterprise fails to perform the services as promised. Sometimes, the HLG Enterprise actually does file mass-joinder complaints, but does not actively prosecute them and often voluntarily dismisses the cases.

The plaintiffs do not dispute consumers' right to challenge alleged fraud by mortgage lenders or servicers, and the underlying merits of the consumers' potential claims that may be stated in the mass joinder lawsuits that the HLG Enterprise files are

not at issue in this action.  Rather, this action is brought against the HLG Enterprise based on its violations of law in the process of recruiting consumers to join those lawsuits and other deceptive business practices.

At its core, regardless of whether the HLG Enterprise refers to itself as a law firm or even has attorneys on staff, it is not fundamentally different from any other loan modification scam, and its conduct is prohibited by both federal and state law. Defendants' practices violate numerous provisions of the Mortgage Assistance Relief Services Rule ("Regulation O"), 12 C.F.R. Part 1015,[2] which was promulgated for the express purpose of preventing this kind of consumer harm. In addition, the defendants violate the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes, ("FDUTPA") and other Florida state laws.

To immediately stop the defendants' illegal practices and preserve assets necessary for consumer redress, the plaintiffs file this motion to issue an *ex parte* temporary restraining order with an asset freeze, appointment of an independent receiver, limited expedited discovery, immediate access to the defendants' business premises, other equitable relief, and an order to show cause why a preliminary injunction should not issue. A proposed TRO, including an Order to Show Cause, has been filed concurrently with this motion. This relief is necessary to prevent continued harm to consumers, dissipation of assets, and destruction of evidence, thereby preserving the Court's ability to provide effective final relief to consumers injured by the HLG Enterprise's illegal practices.

## II. PLAINTIFFS

The Bureau is an independent agency of the United States charged by Congress with enforcing the Consumer Financial Protection Act and other federal consumer financial laws. 12 U.S.C. §§ 5491, 5564. The Bureau has the authority to bring civil actions, by its own attorneys, against persons violating federal consumer financial laws and to "seek all appropriate legal and equitable relief including a permanent or

---

[2] Regulation O was originally promulgated by the Federal Trade Commission as the Mortgage Assistance Relief Services Rule, 16 C.F.R. Part 322. The Bureau re-promulgated the rule in 2011 with no substantive changes, and the citations in this motion are to this version.

temporary injunction as permitted by law." 12 U.S.C. § 5564(a). These consumer financial protection laws include Regulation O. 12 U.S.C. § 5481(13).

The Office of the Attorney General, State of Florida, Department of Legal Affairs, ("the Attorney General") is authorized to enforce federal consumer financial laws pursuant to 12 U.S.C. §§ 5538, 5552, and is the primary enforcing authority of FDUTPA Section 501.203, Florida Statutes, and may also enforce Chapter 812, Florida Statutes. Both FDUTPA and Chapter 812 permit the Attorney General to seek injunctive relief, disgorgement of monies received, and restitution to victims. Sections 501.207 and 812.035, Florida Statutes. Additionally Section 501.207 authorizes the Attorney General to seek civil penalties, asset freezes, the appointment of a receiver, and other appropriate legal or equitable relief; Chapter 812 permits a court to restrict future activities of a defendant, suspend professional licenses, and order the dissolution or reorganization of any enterprise. Section 812.035, Florida Statutes. FDUTPA allows the Attorney General to rely upon statements having circumstantial guarantees of trustworthiness to supplement and explain other evidence, which shall not be excluded as hearsay evidence, even though the declarant is available as a witness as evidence at trial. Section 501.207, Florida Statutes.

Throughout the economic crisis, the Bureau, the Attorney General, and other law enforcement agencies have taken actions and obtained similar relief against similar foreclosure-rescue and loan-modification operations. *See, e.g., FTC v. Wash. Data Resources*, 856 F.Supp.2d 1247, 1251, 1259 (M.D. Fla. 2012); *FTC v. 1st Guar. Mortg. Corp.*, 2011 WL 1233207 at *1 & n.3 (S.D. Fla. Mar. 30, 2011). The Central District of California has previously granted TROs and preliminary injunctions in *CFPB v. Gordon* and *CFPB v. Jalan*, two other mortgage assistance relief cases brought by the Bureau pursuant to its authority under Regulation O and the CFPA. No. CV12-06147 (C.D. Cal Nov. 16, 2012); No. CV12-02088 (C.D. Cal. Dec. 14, 2012).

The Attorney General has pursued cases against law firms engaging in mortgage assistance relief services, *see, e.g., Office of Atty. Gen. v. Hess, et al.*, Case No. 08-007686 (Fla. 17th Cir. Ct. Feb. 21, 2008), *Office of Atty. Gen. v. Mader, et al.*, Case No. 13-12592 (Fla. 15th Cir. Ct. Aug. 8, 2013), and *Office of Atty. Gen. v. Gressier, et al.*, Case No.14-7043 (Fla. 9th Cir. Ct. June 30, 2014), and *ex parte* temporary injunctions have been granted in cases it has pursued against companies offering foreclosure rescue

and other forms of debt relief. *See. e.g.*, *Office of Atty. Gen. v. Berry, et al.*, Case No. 08-49280 (Fla. 17th Cir. Ct. Oct. 13, 2008); *Office of Atty. Gen. v. Keep Your Property Inc, et al.*, Case No. 09-19214 (Fla. 17th Cir. Ct. April 2, 2009); and *Office of Atty. Gen. v. Cherry, et al.,* Case No. 12-26987 (Fla. 17th Cir. Ct. Sept. 25, 2012).

Other law enforcement authorities have taken action against similar "mass-joinder" scams. For example, the California Attorney General recently filed a case against a web of companies and individuals purporting to include consumers in mass-joinder lawsuits in order to obtain mortgage assistance relief, in which California sought and obtained relief similar to what the plaintiffs seek here. *See California v. The Law Offices of Kramer & Kaslow*, No. LC094571 (Cal. Super. Ct. L.A. Cnty. Aug. 15, 2011).

## III.  DEFENDANTS

Individual Defendants Michael Harper, Benn Willcox, and Marc Hoffman operate a mortgage assistance relief scheme through an interrelated network of companies. The enterprise's front is The Hoffman Law Group (HLG), but it also includes the various telemarketing operations, bookkeeping companies, and marketing corporations that are designed to support HLG and funnel consumer fees to Harper and Willcox. As discussed in more detail in Part V.C below, the corporate Defendants operate their scheme as a common enterprise.

### A. Michael Harper

Defendant Harper, a non-attorney resident of North Palm Beach, Florida, operates numerous businesses that together illegally charge an advance fee for mortgage assistance relief services. Harper is formally a co-owner and manager of Nationwide Management Solutions, Legal Intake Solutions, File Intake Solutions, and BM Marketing Group. Featheringill Decl., Ex. 1, ¶¶ 3-4. In practice, Harper leads the entire HLG Enterprise. Stephens Transcript, Ex. 3 at 14-15; Bryant Decl., Ex. 13 ¶ 19.

Harper is in charge of the entire operation from hiring employees and managing the enterprise's finances to writing the intake scripts and overseeing the telemarketers' delivery of it. Stephens Transcript, Ex. 3 at 14, 22, 34, 100, 102, 106; Bryant Decl. Ex. 16 ¶ ¶ 19-23. Despite the fact that Harper is not a licensed attorney, his authority even extends to the legal theories of the cases filed by HLG and the legal advice given to consumers, and he has the authority to hire HLG's attorneys. Stephens Transcript, Ex. 3 at 14, 17, 56-57, 68; Bryant Decl. Ex. 16 ¶ 26. In addition to being an officer of several of

the corporations, Harper is also a signatory to 17 of the HLG Enterprise's 31 known bank accounts. Featheringill Decl., Ex. 1, Attach. A, B; Hanson, Decl., Ex. 14 ¶ 6. According to a former HLG employee, Harper has "the final [say] on everything." Stephens Transcript, Ex. 3 at 15.

Harper's participation in the HLG Enterprise also violates his agreement with the Attorney General to refrain from involvement with attorneys in a foreclosure rescue business or from soliciting the payment of retainers to attorneys, pursuant to the terms of an Assurance of Voluntary Compliance he provided to the Attorney General to settle a previous FDUTPA investigation of a foreclosure rescue business he managed. Featheringill Decl., Ex. 1, Attach. J. Under Florida law, violation of this Assurance is considered prima facie evidence of an additional FDUTPA violation. Section 501.207, Florida Statutes.

### B. Benn Willcox

Defendant Willcox, a non-attorney resident of Jupiter, Florida, works alongside Harper to operate this illicit mortgage assistance relief scheme. He is formally a co-owner and manager of Nationwide Management Solutions, Legal Intake Solutions, File Intake Solutions, and BM Marketing Group. Featheringill Decl., Ex. 1 ¶¶ 3-4. In practice, he exerts managerial responsibility for the whole enterprise. Stephens Transcript, Ex. 3 at 17-18; Bryant Decl. Ex. 16 ¶ 28.

Willcox manages the financial aspect of the HLG Enterprise. He is in charge of billing clients, collecting on past due accounts, and handling consumer complaints. Stephens Transcript, Ex. 3 at 17-18. He is a signatory to 17 of the HLG Enterprise's 31 known bank accounts. Hanson Decl., Ex. 14, ¶ 7.

### C. Marc Hoffman

Defendant Hoffman, a resident of Boca Raton, Florida, is the HLG Enterprise's frontman. Hoffman is formally HLG's President and the enterprise holds Hoffman out as the managing partner of the law firm. Featheringill Decl., Ex. 1 ¶ 3; Stephens Transcript, Ex. 3 at 21-22. In addition to being the named individual in the enterprise's public-facing company (the *Hoffman* Law Group), the HLG Enterprise's solicitations invite consumers to verify the group's legitimacy by searching the District of Columbia and Florida Bar Associations' websites for Hoffman's licensure. Solis Decl., Ex. 6,

Attach. A. HLG's website lists Hoffman as the "Managing Partner" and describes his role as "coordinat[ing] the legal staff and litigation team." Godard Decl., Ex. 4, Attach A.

In addition, Hoffman is a signatory to 12 of the HLG Enterprise's 31 known bank accounts. Hanson Decl., Ex. 14 ¶ 8. An attorney licensed to practice in Florida and the District of Columbia, Hoffman is also the attorney of record on at least thirteen of the mass-joinder lawsuits that HLG has filed, including at least two in this court. Rosario Decl., Ex. 2 ¶10; List of Known HLG Enterprise Cases, Ex. 9.

### D. Corporate Defendants

Defendant The Hoffman Law Group, P.A. is a Florida corporation formed by Hoffman as "The Residential Litigation Group, P.A." on April 16, 2012 and renamed "The Hoffman Law Group, P.A." on November 26, 2012. Featheringill Decl., Ex. 1 ¶ 3. Its current address is 860 U.S. Highway 1, Suite 111, North Palm Beach, Florida, but it has also purported to do business at 2200 Pennsylvania Ave NW, 4th Floor, Washington, DC. *Id*.; Brooks Decl., Ex. 7, Attach. E. HLG is the centerpiece of the group's mortgage assistance relief scam.

Defendant Nationwide Management Solutions, LLC, which operates the human resources side of the enterprise, is a Florida limited liability company formed by Harper on April 26, 2012. Featheringill Decl., Ex. 1 ¶ 4. Its current address is 860 U.S. Highway 1, Suite 209, North Palm Beach, Florida. *Id*.

Defendant Legal Intake Solutions, LLC, one of the telemarketing firms, is a Florida limited liability company formed by Harper on November 3, 2011. *Id*. Its current address is 860 U.S. Highway 1, Suite 205, North Palm Beach, Florida. *Id*.

Defendant File Intake Solutions, LLC, the other telemarketing firm of the HLG Enterprise, is a Florida limited liability company formed by Harper on July 16, 2013. *Id*. Its current address is 860 U.S. Highway 1, Suite 205, North Palm Beach, Florida, in the same suite as Legal Intake Solutions. *Id*.

Defendant BM Marketing Group, which funnels final profits to Harper and Willcox, is a Florida limited liability company formed by Harper on October 18, 2012. *Id*. Its current address is 860 U.S. Highway 1, Suite 205, North Palm Beach, Florida, within the same suite as Legal Intake Solutions and File Intake Solutions. *Id*.

Defendants operate their scheme out of a series of overlapping suites in the same office building, with employees coming and going between them. For example,

Hoffman's office was within the suite that houses Legal Intake Solutions and File Intake Solutions, even though he is "the Managing Partner" of HLG. Stephens Transcript, Ex. 3 at 15-17; Godard Decl., Ex. 4, Attach. A.

## IV.   DEFENDANTS' BUSINESS PRACTICES

Since at least early 2012, the HLG Enterprise has engaged in an ongoing, illicit mortgage relief scheme that preys on financially distressed homeowners nationwide. Defendants use various marketing methods to attract struggling homeowners by deceptively promising foreclosure relief or mortgage modifications that will make consumers' payments substantially more affordable. As part of their scheme, the HLG Enterprise promises to include consumers in mass-joinder lawsuits, telling consumers that the lawsuits will induce lenders and servicers to modify the consumers' mortgages. They use these promises to convince consumers to pay thousands of dollars to the HLG Enterprise before the enterprise obtains, or even tries to obtain, mortgage modifications.

In reality, the defendants provide no meaningful assistance to consumers. Rather, because of the HLG Enterprise's wild overpromises and lack of results, consumers are left in a worse position than when they started, sometimes losing their home to foreclosure or being forced to enter bankruptcy. Harper, Willcox, and Hoffman, meanwhile, reap significant profits.

### A. The HLG Enterprise makes numerous misrepresentations while promising to include consumers in mass-joinder lawsuits.

The core of the HLG Enterprise's scheme is the promise to include consumers in mass-joinder lawsuits. The HLG Enterprise solicits consumers through websites, mass-mailers, telemarketing, and TV advertisements, all of which are designed to give the impression that by paying HLG, the consumers will get help with their mortgages.

HLG's website advertises the company as "Multi-Plaintiff Mortgage Litigation Attorneys." Godard Decl., Ex. 4, Attach. A. When HLG went by the name "Residential Litigation Group," its website described itself as "a leading litigation law firm based out of Washington D.C." *Id.* at Attach. C. It claimed that the company was "suing the nation's biggest banks and lenders alleging deceptive loan practices and deceptive mortgage modification practices, among other causes of action." *Id.* The HLG Enterprise tells consumers that the lawsuits will induce lenders and servicers to modify the

7

consumers' mortgages. One of HLG's websites advertised that the company "is looking to expose the bank for its wrong doings and force them into a situation where they will want to settle with our firm to avoid an expensive and public trial." *Id.* It also claimed, "Our goal in our settlement offers will be a reduction in principal balance and interest rate." *Id.* Its current website claims, "Our firm will demand a settlement to reflect positive equity, a lower fixed interest rate, a cash settlement for punitive damages, a reinstatement of credit rating, and a waiver of all delinquent payments/penalties/interest and other economic benefits for all plaintiffs." *Id.* at Attach. A.

The HLG Enterprise also sends out mailers to consumers. Featheringill Decl., Ex. 1 Attach H; Brooks Decl., Ex. 7 ¶ 2; Herron Decl., Ex. 8 ¶ 4; Stephens Transcript, Ex. 3 at 32. One of the mailers received by a consumer in Georgia claimed that HLG would negotiate with her lender on her behalf. Herron Decl., Ex. 8 ¶ 4. HLG's mailers also stated that HLG "is intending to file a potential claim against [the individual's lender] aimed at improper lender actions" and that the recipient "may be a potential plaintiff in a national lawsuit." Featheringill Decl., Ex. 1, Attach. H.

Another way the HLG Enterprise solicits consumers is through television advertising, which portrays HLG as part of the programs instituted by President Obama in order to help consumers facing mortgage problems and display an 800 number for consumers to call. Stephens Transcript, Ex. 3 at 32.

All of the solicitations are designed to get consumers to call and speak with an intake representative. The HLG Enterprise also employs outbound telemarketing in order to get consumers on the phone with an intake representative. Solis Decl., Ex. 6 ¶ 4; Stephens Transcript, Ex. 3 at 31-34. Defendants' telemarketers, who are not attorneys, provide misleading advice to homeowners regarding the likely results and benefits of joining the mass-joinder lawsuits. Bryant Decl., Ex. 13 ¶¶ 37-41.

Once the defendants have a consumer on the phone, the intake representative, who is not an attorney, makes a pitch that HLG can help the consumer avoid foreclosure or get a mortgage modification. According to one consumer, "the person I spoke with told me that the company would help me get a mortgage modification. [HLG] told me that they would decrease the interest rate on my mortgage to 2%, improve my credit, and include me in a mass lawsuit against Bank of America." Herron Decl., Ex. 8 ¶ 4. *See*

*also* Solis Decl., Ex. 6, Attach. A. Another consumer reports, "[HLG] told me that they would work with my lender to reduce the interest rate on my mortgage, as well as the principal so that I could get my money back. ... [HLG] also told me that they were preparing a lawsuit that I could join." Brooks Decl., Ex. 7 ¶¶ 3-4. The defendants told a third consumer that her "case would result in a loan modification." Featheringill Decl., Ex. 1, Attach. H ¶ 5. Yet another consumer reports that he was told "that my case would take between 6-9 months and that when [HLG] prevailed, I would own my house and have no mortgage." Featheringill Decl., Ex. 1, Attach I ¶ 3. One former employee estimates that more than 75% of the time consumers are also told that they will get lump sum cash settlements. Stephens Transcript, Ex. 3 at 77. And consumers are frequently told that by signing up with HLG, they will postpone or prevent foreclosure. Stephens Transcript, Ex. 3 at 114; Solis Decl., Ex. 6, ¶ 22, Attach. D.

During this initial call, the intake rep also claims that HLG has successfully helped other consumers. Bryant Decl., Ex. 13 ¶ 38. For example, the defendants told one consumer that they had helped stop other clients' foreclosures. Herron Decl., Ex. 8 ¶ 4. Another consumer was told "that HLG had helped people like me and that those people were being compensated generously." Solis Decl., Ex. 6 ¶ 9.

### B. The HLG Enterprise tells consumers to stop communicating with their lenders and to stop making their mortgage payments.

In order to advance their scheme, the defendants sometimes tell consumers to stop communicating with their lenders and servicers. Bryant Decl., Ex. 13 ¶ 43. This way, the consumers' lenders will not alert them to the HLG Enterprise's illegitimacy. As one consumer reports, "[HLG] assured me that they would handle all communication with my lender and have them stop calling me." Brooks Decl., Ex. 7 ¶ 3. *See also* Herron Decl., Ex. 8 ¶ 5.

The HLG Enterprise furthers the representation that consumers should cease communicating with their lenders and servicers by having them sign authorization letters that give HLG the authority to "communicate with any or all of my creditors." Herron Decl., Ex. 8, Attach. F; Brooks Decl., Ex. 7, Attach. I.

Additionally, the HLG Enterprise sometimes instructs consumers to stop making their mortgage payments. Solis Decl., Ex. 6, ¶ 7; Herron Decl., Ex. 8 ¶ 5; Bryant Decl., Ex. 13 ¶¶ 43, 54. This is critical to the defendants' scheme because their target

9

consumers are already having trouble making their mortgage payments, yet the HLG
Enterprise is asking for hundreds or thousands of dollars a month from each consumer;
Defendants need consumers to stop making their mortgage payments so that consumers
have enough money in their budgets to pay the defendants instead. Bryant Decl., Ex. 13
¶ 43.

### C. The HLG Enterprise illegally charges an upfront fee.

Defendants charge consumers a fee before they obtain, or even try to obtain a
mortgage modification. Bryant Decl., Ex. 13 ¶ 47 ("Other than making initial contact
with the lender, HLG did no work on a client's file until this $6,000 was paid"). The
HLG Enterprise's standard payment structure is a $6,000 initial fee, styled as a
"retainer," which may be broken up into smaller monthly payments. Stephens
Transcript, Ex. 3 at 18; Bryant Decl., Ex. 13 ¶ 46; Solis Decl., Ex. 6 ¶ 6, Attach. B; Brooks
Decl., Ex. 7 ¶ 7, Attach. A-D; Herron Decl., Ex. 8 ¶ 7, Attach. D; Featheringill Decl., Ex. 1,
Attach H ¶ 5. After paying the initial $6,000 fee, consumers must pay a "monthly
maintenance fee," which is usually $495 per month, but can be lower for some
consumers. Stephens Transcript, Ex. 3 at 18; Bryant Decl., Ex. 13 ¶¶ 48-49; Brooks
Decl., Ex. 7 ¶ 7; Solis Decl., Ex. 6 ¶¶ 6-16, Attach. B; Herron Decl., Ex. 8 ¶ 7, Attach. D.

Despite being charged a "retainer" fee and a "maintenance" fee, consumers are
also told that HLG works on contingency. Stephens Transcript, Ex. 3 at 77-78; Solis
Decl., Ex. 6, Attach B. Defendants tell consumers that HLG has a 30% contingency fee
and that whatever consumers had paid out of pocket for the "retainer" or "maintenance"
fee will be credited back to them out of the 30% fee. Solis Decl., Ex. 6, Attach. B.

Consumers are asked to pay the defendants in a variety of different ways. The
HLG Enterprise has used at least two third-party payment processors, Meracord and
Global Client Solutions. Hanson Decl., Ex. 14, ¶ 9. The Bureau entered into a Stipulated
Final Judgment and Consent Order with Meracord in October 2013 settling claims that
Meracord facilitated the unlawful activities of debt-relief service providers, including
those providers' charging illegal upfront fees. Complaint; Stipulated Final Judgment
and Consent Order, *CFPB v. Meracord LLC*, No. CV13-05871 (W.D. Wash. Oct. 4, 2013),
Ex. 11. The HLG Enterprise took in approximately $1.8 million in consumer payments
during the period of May 2012 through January 2013 through Meracord alone. Heidari
Decl., Ex. 5 ¶ 7. The HLG Enterprise also takes payments through checks and recently

began accepting payment by credit card as well. Hanson Decl., Ex. 14 ¶ 9; Stephens Transcript, Ex. 3 at 126.

Using a complicated web of at least 25 corporate bank accounts in at least five banks, the HLG Enterprise freely transfers these consumer fees between the companies that make up the enterprise and regularly funds apparently personal items such as car leases, car washes, and meals at restaurants, and thousands of dollars in payments to the individual defendants' American Express cards. Hanson Decl., Ex. 14 ¶ 15.

### D. The HLG Enterprise does not provide true legal services.

After a consumer has agreed to pay the fee and signs a contract the HLG Enterprise finally sets up a call between the consumer and a lawyer. At that point, the lawyer, called a "Case Management Attorney," typically continues the sales pitch. These employees' main job is to read from scripts provided to them by HLG management, rather than to perform actual legal work. *See generally*, Stephens Transcript, Ex. 3. The defendants' script instructs its case management attorneys to tell consumers:

> We are seeking, whether through settlement with your particular lender or through a court judgment, a significant reduction in your mortgage balance, "significant" being the operative word here, coupling that with reducing your interest rate to at or below market interest rate; additionally, we are demanding that any past due payments are forgiven so that you get a true fresh start and that the lender eliminate any negative credit record they have placed on your credit report. This should result in a monthly payment that is affordable to you.

Stephens Transcript, Ex. 3, Attach. B.

The script also has the attorneys tell consumers "It is our belief that [your mortgage] was arrived at by the bank committing fraud, violating TILA, violating RESPA, and federal mortgage-writing regulations." *Id.* The HLG Enterprise makes this claim even though the script is a "Welcome Script" and is delivered when so little review of an individual's file has been done that part of the script has the attorneys confirming the consumer's address. *Id.* Some case management attorneys also represent to consumers that they should stop making their mortgage payments. Stephens Transcript, Ex. 3 at 43.

A former case management attorney at the HLG Enterprise says that consumers "were basically told through the script that they were going to get relief on their mortgage. I mean, that was the major selling point." *Id.* at 35. Another former employee

says, "Case management attorneys did not appear to know anything about the progress of the litigation." Bryant Decl., Ex. 13 ¶ 65.

### E. The HLG Enterprise fails to make legally mandated disclosures.

Defendants fail to make nearly all of the disclosures mandated by Regulation O in their mail solicitations, on their websites, and during telephone calls with consumers. Specifically, their solicitations fail to disclose in a clear and prominent manner that: (1) Defendants are not associated with the government or approved by the government or the consumer's lender; (2) the consumer can stop doing business with the defendants and can reject any offer obtained by them; and (3) even if the consumer uses the HLG Enterprise's service, the consumer's lender may not agree to modify the loan. 12 C.F.R. § 1015.4(a)-(b). During the defendants' sales calls, the HLG Enterprise entirely fails to make these disclosures. Stephens Transcript, Ex. 3 at 39; Solis Decl., Ex. 6 ¶¶ 13-15; Brooks Decl., Ex. 7 ¶¶ 5-6; Herron Decl., Ex. 8 ¶¶ 8-10.

File Intake Solutions is licensed by the Florida Department of Agriculture and Consumer Services to conduct telemarketing operations. In applying for this license, the defendants were required to submit a sample telemarketing script. But even in this version of the script—*a script specifically meant to be seen by regulators*—the defendants fail to include the disclosures required by Regulation O. Featheringill Decl., Ex. 1, Attach. K.

Regulation O requires that these disclosures be placed in a "clear and prominent manner," and when made in textual communications, must "be preceded by the heading 'IMPORTANT NOTICE,' which must be in bold face font that is two-point type larger than the font size of the required disclosures." 12 C.F.R. §§ 1015.4(a)(3), 1015.4(b)(4). Regulation O defines "clear and prominent manner" as requiring the textual disclosures to be made in, "at a minimum, the larger of 12-point type or one-half the size of the largest letter or numeral used in the name of the advertised Web site or telephone number to which consumers are referred." 12 C.F.R. § 1015.2. Even though the HLG Enterprise's marketing materials, including their website, sometimes contain fine print disclosures, they are not displayed clearly and prominently nor do they contain all the required information. Godard Decl., Ex. 4, Attach. A, C; Brooks Decl., Ex. 7, Attach. H; Featheringill Decl., Ex. 1, Attach. H.

And when the defendants tell consumers to stop paying their mortgages, they fail to make the disclosure required under Regulation O that "[i]f you stop paying your mortgage, you could lose your home and damage your credit rating." 12 C.F.R. § 1015.4(c); Solis Decl., Ex. 6 ¶ 8; Herron Decl., Ex. 8, ¶ 6; Brooks Decl., Ex. 7 ¶ 5; Stephens Transcript, Ex. 3 at 39, 43.

### F. The HLG Enterprise fails to deliver on promised services.

Despite its promises and the fact that it has taken in substantial consumer payments, the HLG Enterprise does not obtain the foreclosure relief or mortgage loan modifications that it promises.

Sometimes, though not always, consumers are actually named plaintiffs in mass-joinder lawsuits. For many of the cases, the HLG Enterprise contracts out the filing of the lawsuits to attorneys who are licensed to practice in New York, and sometimes Hoffman is the attorney of record on cases filed in Florida. But regardless of who the attorney of record is, Harper maintains total control over the content of the complaints. Stephens Transcript, Ex. 3 at 14, 17, 56-57, 68; Bryant Decl. Ex. 16 ¶ 26. A list of the lawsuits that HLG has filed is attached as Exhibit 9.

Many, if not all, of these lawsuits are flagrant abuses of the federal court system, adding up to a massive misuse of court resources. At bottom, the complaints read like general grievances against banks, using buzzwords like the "Troubled Assets Relief Program," the "Mortgage Electronic Registration System," and "mortgage-backed securities," boiling down to an alleged contractual duty to modify the consumers' loans. On top of the poorly-pleaded allegations, in many cases, the plaintiffs and defendants are grouped together with no apparent logic, leaving them open to obvious severance under Rule 21 (which, of course, would defeat the entire "mass-joinder" concept). *See, e.g.,* Herron Decl., Ex. 8 Attach. I.

The HLG Enterprise expresses no concern about the cases being dismissed. Stephens Transcript, Ex. 3 at 65-66. In addition, HLG often voluntarily dismisses their cases. For some consumers, where this has happened to their cases more than once, it may prohibit them from ever bringing similar claims against their lenders due to Rule

41. Fed. R. Civ. P. 41.[3] Nor did the HLG Enterprise ever even prepare for the discovery phase of trial, even months after filing the complaints, suggesting that the lawsuits themselves are merely fronts in order to try to keep consumers from getting suspicious and in attempt to take advantage, under false pretenses, of regulatory exemptions for the practice of law. Stephens Transcript, Ex. 3 at 68-69. At least one judge who was assigned one of HLG's cases openly expressed concerns about the conduct of the HLG operation. Correspondence re: Isabella Solis, *Martin v. Bank of America*, No. 13-cv-02350 (E.D.N.Y. April 21, 2014), Ex. 10.

Consumers often have difficulty even getting in touch with the defendants after they have paid their initial fee. Herron Decl., Ex. 8 ¶¶ 16-20; Brooks Decl., Ex. 7 ¶¶ 12-13; Featheringill Decl., Ex. 1, Attach. I ¶ 4. One consumer, who finally got in touch with her case management attorney, was told that she was "one of the ones who slipped through the cracks." Herron Decl., Ex. 8 ¶ 20. When they are able to reach the defendants, the HLG Enterprise misleads them about how much progress they are making on the cases. Stephens Transcript, Ex. 3 at 68; Bryant Decl., Ex. 13 ¶ 67.

Despite defendants' representations to consumers that HLG will help them get mortgage modifications or prevent foreclosure, an attorney who worked at HLG for nearly a year is aware of only *one* mortgage modification that defendants obtained for a consumer, and she is aware of no foreclosures that were delayed or prevented through the enterprise's efforts. Stephens Transcript, Ex. 3 at 70-71. In short, the HLG Enterprise does not help consumers. *Id.*[4]

### G. Instead of helping consumers, the HLG Enterprise's failure to deliver on its promises causes consumer harm.

---

[3] For example, at least two consumers were plaintiffs in *Nabedrik v. Emigrant Mortgage Co.* and *Kelly v. Am. Home Mortgage Holdings*, each of which was voluntarily dismissed by HLG. *See* List of Known HLG Cases, Ex. 9.

[4] *See also,* Bryant Decl., Ex. 13 ¶ 72 ("I am not aware of HLG negotiating a mortgage modification for any of its clients); Soave Decl. Ex. 11, ¶ 17 ("I am not aware of HLG playing any role in obtaining a mortgage modification for any of its clients"); Brooks Decl., Ex. 7 ¶ 14 ("[HLG] did not obtain a mortgage modification for me"); Herron Decl., Ex. 8 ¶ 30 ("[HLG] never got me a modification to my mortgage"); Solis Decl., Ex. 6 ¶ 25 ("HLG never got me a mortgage modification"); Featheringill Decl., Ex. 1 Attach. H ¶ 9 ("I have paid [HLG] over $14,000 and seen no evidence that they have done anything for me"); Featheringill Decl., Ex. 1 Attach. I ¶ 5 ("I can find no evidence that [HLG] has done anything on my behalf").

The HLG Enterprise's failure to deliver on its promises causes substantial harm to consumers. Defendants preyed on one consumer, whom they charged $650 per month even though she kept asking if she could lower her payments, telling them that she and her husband were eating one bowl of oatmeal a day and that was all they had. Stephens Transcript, Ex. 3 at 52. When one of the enterprise's employees brought this to the attention of Hoffman, Hoffman responded, "What do you want me to do? Take up a food donation for her?" *Id.*

Indeed, not only does the HLG Enterprise charge thousands of dollars per consumer and then fail to deliver on its representations, it can actually make consumers far worse off. A Georgia consumer followed the HLG Enterprise's advice and stopped making payments on her mortgage loan, and so Bank of America foreclosed on her home. Herron Decl., Ex. 8 ¶¶ 14, 22, 25, 30. One New Mexico consumer had actually managed to get a mortgage modification on her own, which reduced her payments to $800 a month and she began being able to pay her mortgage loan. Solis Decl., Ex. 6 ¶ 3. But when the HLG Enterprise contacted her, it convinced her to stop making those mortgage payments in order to pay the HLG Enterprise instead. *Id.* ¶¶ 7, 12. This resulted in the consumer's lender sending her a foreclosure notice, and she ended up having to file for bankruptcy in order to save her home. *Id.* at ¶¶ 21, 26. A former employee is aware of numerous victims of the HLG Enterprise's scheme who lost their homes to foreclosure because they were depending on the defendants. Bryant Decl., Ex. 13 ¶ 73. In addition, there is evidence that the HLG Enterprise continues to charge consumers after their cases have been dismissed by a court. Stephens Transcript, Ex. 3 at 109.

Even more, the HLG Enterprise sometimes takes on clients that it could never possibly help in the first place. For instance, the defendants enroll many consumers who do not even have an ownership interest in the property they are trying to save, such as one consumer whose husband was the sole borrower on the mortgage, but whom the HLG Enterprise nonetheless knowingly charged over $14,000 and included as a plaintiff in one of the mass-joinder suits. Featheringill Decl., Ex. 1 Attach. H ¶ 5; *See also* Stephens Transcript, Ex. 3 at 113; Bryant Decl., Ex. 13 ¶ 44. Defendants have also solicited and signed up several consumers who owned mobile homes despite the fact that Defendants  know that a mobile home would be subject to repossession rather than

15

foreclosure and that these consumers would have no claim in the lawsuits HLG files. Stephens Transcript, Ex. 3 at 89-90, 112. Nonetheless, the HLG Enterprise bilks these consumers for thousands of dollars.

## V. ARGUMENT

The plaintiffs seek a permanent injunction and other equitable relief to protect consumers from future harm and to redress the injury caused by the HLG Enterprise. To preserve the possibility of effective final relief and prevent the defendants from further violating the law during this action's pendency, the Court should grant this application for an *ex parte* TRO, including an asset freeze, appointment of a temporary receiver, and immediate access to the defendants' business premises.

### A. The Consumer Financial Protection Act, Florida Deceptive and Unfair Trade Practices Act, and Chapter 812, Florida Statutes authorize this Court to grant the requested relief.

The CFPA vests the Bureau and the Attorney General with the authority to prevent violations of federal consumer financial law, including Regulation O, 12 U.S.C. §§ 5536, 5538, 5552, by commencing a civil action seeking all appropriate equitable relief, including a permanent or temporary injunction. 12. U.S.C. § 5564(a)-(b). The CFPA authorizes this Court to order any appropriate equitable relief, including the rescission of contracts, restitution, and disgorgement of ill-gotten gains or compensation for unjust enrichment. 12 U.S.C. § 5565(a)(2). The Attorney General is authorized to seek similar relief under FDUTPA and Chapter 812, Florida Statutes.

### B. Defendants' violations warrant a TRO and Preliminary Injunction.

The standard for issuing a TRO is the same as for a preliminary injunction. *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2011); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223 1225-26 (11th Cir. 2005). This standard requires that the plaintiffs establish four elements: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of hardships tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008); *See also Grizzle v. Kemp*, 634 F.3d 1314, 1320 (11th Cir. 2011). When the government is a party, courts will combine the third and fourth elements, weighing harm to the public interest as a hardship on the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Scott v.*

16

*Roberts,* 612 F.3d 1279, 1290 (11th Cir. 2010); *K.G. ex rel. Garrido v. Dudek,* 839 F.Supp.2d 1254, 1260 (S.D. Fla. 2011). In this case, the plaintiffs readily meet each element of the standard and present ample evidence to justify the entry of a TRO and preliminary injunction.

> **1. The plaintiffs are likely to succeed on the merits because the HLG Enterprise violates Regulation O and Florida state laws.**

The HLG Enterprise violates four key provisions of Regulation O, which federal government regulators promulgated specifically to protect consumers from mortgage relief scammers like the defendants. Mortgage Assistance Relief Services Rule, 75 Fed. Reg. 75, 090, 75,097-98. The HLG Enterprise (1) collects prohibited upfront fees; (2) makes prohibited representations; (3) makes prohibited misrepresentations; and (4) fails to make mandatory disclosures.  Additionally, the HLG Enterprise engages in practices that violate FDUTPA and their deception amounts to theft under Florida law.

> **a. Regulation O applies to Defendants.**

Regulation O defines mortgage assistance relief services to include any service offered to a consumer in exchange for consideration, that is represented to assist or attempt to assist in obtaining a loan modification and saving the consumer's dwelling from foreclosure. 12 C.F.R. § 1015.2. A mortgage assistance relief service provider means "any person that provides, offers to provide, or arranges for others to provide, any mortgage assistance relief service." *Id.*

Here, the corporate and individual defendants are mortgage assistance relief service providers because they offer consumers spots in the mass-joinder lawsuits under the representation that the lawsuits will assist consumers with obtaining modifications of their mortgage loans. *See supra* Part IV.A. They represent to consumers that either the litigation will result in a judgment that lowers their interest rate, monthly payment, or principal balance, or that the filing of the lawsuit itself will provide enough leverage to convince lenders to provide modifications. *Id.*

> **b. The HLG Enterprise violates three key provisions of Regulation O.**

The core practices of the HLG Enterprise's business violate key protections provided in Regulation O. Most significantly, HLG Enterprise violates the provision prohibiting any mortgage assistance relief service provider from requesting or receiving

payment of any fee until the consumer has executed a written agreement between the consumer and the consumer's loan holder or servicer that incorporates the offer that the provider obtained. 12 C.F.R. § 1015.5(a). This provision prevents consumers from having to pay for promises of relief that never materialize. But the HLG Enterprise charges and collects a $6,000 upfront initial fee and $495 upfront monthly maintenance fees before the defendants obtain mortgage modifications. *See supra* Part IV.C, F, G.

Regulation O also prohibits any mortgage assistance relief service provider from (1) representing, expressly or by implication, that a consumer cannot or should not contact or communicate with her lender or servicer or (2) misrepresenting that a consumer is not obligated to continue paying her mortgage loan. 12 C.F.R. § 1015.3(a)-(b). The HLG Enterprise regularly makes these representations and misrepresentations to consumers. *See supra* Part IV.B.

Finally, as discussed above, the HLG Enterprise fails to make the contractual disclosures specifically required by Regulation O. *See supra* Part IV.E; 12 C.F.R. § 1015.4.

### c. The fact that the HLG Enterprise has attorneys on staff does not permit it to violate Regulation O.

Both the CFPA and Regulation O provide for attorney exemptions in certain circumstances, but despite the HLG Enterprise's having attorneys on its staff, neither exemption applies in this case, leaving the defendants' conduct subject to the Bureau's authority.

Under the CFPA, an attorney's activities as part of his practice of law in the state in which he is licensed to practice law are often exempt from the Bureau's enforcement authority. 12 U.S.C. § 5517(e). But among other clawbacks to this exemption, the CFPA authorizes the Bureau to bring enforcement actions against an attorney if that attorney is otherwise subject to any of the enumerated laws transferred to the Bureau. 12 U.S.C. § 5517(e)(3). This includes the 2009 Omnibus Appropriations Act, under which Regulation O was promulgated. 12 U.S.C. §§ 5538, 5481(12)(Q).

Regulation O itself also contains an exemption for attorneys under certain circumstances, but the defendants do not qualify for this exemption either. Except for the advance fee ban, an attorney is exempt from Regulation O if the attorney: (1)

18

provides mortgage assistance relief services as part of the practice of law; (2) is licensed to practice law in the state in which the consumer or the consumer's dwelling is located; and (3) complies with state laws and regulations relating to the same general types of conduct that the rule addresses. 12 C.F.R. § 1015.7(a). Defendants, however, prey on consumers from all across the country, despite only having attorneys licensed to practice in a few states. Heidari Decl., Ex. 5 ¶ 6; Rosario Decl., Ex. 2, ¶¶ 7-11 & Attach. H.

Defendants' lack of appropriate attorney licenses would be enough to require the defendants to comply with Regulation O, but what is more, the HLG Enterprise is further not exempt because it does not comply with applicable state law, as described in detail in subsections (d) and (e) below. In promulgating the rule, the FTC made clear that complying with the attorney exemption required compliance with state laws and regulations that address "the competent and diligent provision of legal services, communication with clients, charging and receipt of fees, promotion of services, and not engaging in fraudulent or deceitful conduct." Mortgage Assistance Relief Services, 75 Fed. Reg. 75090, 75128 (Dec. 1, 2010).[5] Moreover, the HLG Enterprise is centered on the promise of assisting consumers with mortgage relief, not providing general legal services. Thus, the defendants are required to comply with Regulation O.

In order to be exempt from the advance fee ban, an attorney must meet the above requirements *and must also*: (1) deposit any funds received from the consumer in a client trust account prior to performing legal services; and (2) comply with all state laws and regulations, including licensing regulations, applicable to client trust accounts. 12 C.F.R. § 1015.7(b). In this case, the HLG Enterprise's bank records show numerous instances in which client funds are placed directly into regular operating accounts. Hanson Decl., Ex. 14 ¶ 10. And even where the HLG Enterprise puts client funds into a trust account, they use it merely as a pass-through, often transferring the exact amount of client funds into an operating account the same day that amount is deposited into the trust account. *Id.* at ¶ 11.

Accordingly, the defendants are not exempt from any provisions of Regulation O, and their violations described herein demonstrate a clear likelihood of the plaintiffs' success on the merits of their Regulation O claims.

---

[5] A defendant's failure to comply with specific state-level MARS Rules would also destroy a claim of safe harbor under the attorney exemption. *Id.*

**d. The HLG Enterprise has engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce, in violation of Florida's Deceptive and Unfair Trade Practices Act.**

Under FDUTPA, the practice of engaging in unfair or deceptive acts in the conduct of trade or commerce is prohibited.  Florida follows the "standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts." Section 501.203(3)(b), Florida Statutes. To that end, the Florida Supreme Court has noted a deceptive practice is one which "involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances." See *PNR Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003); *Millennium Communications & Fulfillment, Inc. v. Department of Legal Affairs,* 761 So.2d 1256, 1263 (Fla. 3rd DCA 2000); *FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1029 (7th Cir. 1988); *FTC v. Wilcox*, 926 F.Supp 1091, 1098 (S.D. Fla. 1995). Trade or commerce is defined under FDUTPA as "the advertising, soliciting, providing, offering, or distributing" of any good or service by any person. Section 501.203(8), Florida Statutes.  Attorneys and law firms are not exempt from FDUTPA.[6]

To determine whether a representation is deceptive, courts must consider "the impression created by the representation, not its literal truth or falsity." *FTC v. Peoples Credit First, LLC*, 2005 WL 3468588 (M.D. Fla. 2005), aff'd 2007 WL 2071712 (11th Cir. 2007) (citing *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496 (1st Cir. 1989) (*quoting Am. Home Prods. Corp. v. FTC,* 695 F.2d 681, 687 (3d Cir. 1982).  Advertising claims are deceptive if they have the capacity to convey misleading impressions to consumers even though non-misleading interpretations may be possible. *Dept. of Legal Affairs v. Father and Son Moving & Storage,* 643 So.2d 22, 26 (Fla. 4th DCA 1994).

---

[6] See Section 501.212, Florida Statutes, which lists activities exempt from FDUTPA, and does not include the practice of law. *See, Order on Def. Eric Mader and Mader Law Group Motion To Dismiss, Office of the Atty. Gen. v. Mader, et al.,* Case No. 13-12592 (Fla. 15th Cir. Ct. Aug. 8, 2013); *Kelly v. Nelson, Mullins, Riley & Scarborough, LLP,* 2002 WL 598427 at *9 (M.D. Fla. 2002) ("Plaintiff's allegations concerning unfair and deceptive trade acts committed by Defendants in the process of providing legal services state a claim under the broad provisions of FDUTPA"); *Kelly v. Nelson, Mullins, Riley & Scarborough, LLP,* 2004 WL 4054841at *9 (M.D. Fla. 2004) (Assumes, given FDUPTA's liberal construction, that the provision of legal services is covered by the definition of trade or commerce).

The HLG Enterprise's practice of offering services to consumers to assist them in reducing their mortgage interest rates and indebtedness, eliminating fees and past due payments, restoring damaged credit ratings, obtaining monetary relief and damages from their mortgage holder, and similar services, as well as its use of television advertising, direct mail advertising, and telemarketers, constitute engaging in "trade or commerce" as defined by FDUTPA, and the numerous misrepresentations it has made and continues to make to its clients and prospective clients are facially deceptive.

The conduct of the HLG Enterprise also violates FDUTPA's prohibition against unfair business practices. Florida has adopted the 1980 FTC standard for unfairness, which requires a three-pronged test to show that consumer injury is (1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) an injury that consumers themselves could not have reasonably avoided. *Porsche Cars of North America v. Diamond*, 2014 WL 2599682 (Fla. 3d DCA 2014).

Many HLG clients have lost their homes to foreclosure because they were using their very limited funds to pay for the fruitless litigation pursued by HLG. Bryant Decl., Ex. 16 at ¶¶ 54, 70. Other clients are actually hampered in their efforts to negotiate modifications directly with their lender because HLG informs the lender that the homeowner is represented by counsel. Id. at ¶ 68. Even for those clients who have not lost their homes, the losses they incur in paying the HLG retainer and monthly maintenance fees are substantial.

HLG clients have received no benefit from the litigation. In its years of operation, HLG has yet to even attempt to negotiate any terms of a settlement for any of the mass-joinder cases it has filed, nor has it conducted any discovery or engaged in any conduct designed to move the litigation forward. Id. at ¶¶ 71-73.

Once a consumer is convinced to sign up as an HLG client through the misrepresentations made by its intake staff, there is little or nothing the consumer can do to avoid the harm brought by HLG's practices. HLG's clients are consistently being misinformed that the mass-joinder litigation is being aggressively pursued and that they just need to remain patient. The company's scripted answer to clients who express concern over the time it has taken to pursue the litigation is that "this is complex federal litigation. We are in litigation with the largest lenders in America and these types of

results won't happen overnight." Id. at ¶ 67. HLG attorneys and their staff go to great efforts to appease any customers who threaten to stop paying their monthly maintenance fees in order to induce them to keep paying. If the attorneys' efforts fail, the caller is then handed off to Michael Harper, who does his best to persuade the client to keep paying the monthly fee. Id. at ¶¶ 52-53.

Additionally, Harper's management role in the HLG Enterprise is a clear violation of the Assurance of Voluntary Compliance ("AVC") he entered into with the Attorney General, which prohibits him from involvement with attorneys engaged in foreclosure rescue and from soliciting the payment of retainers to attorneys. Featheringill Decl., Ex. 1, Attach. J at ¶ 2.8. In direct violation of the AVC, Harper compensates Hoffman and the other attorneys employed by HLG to provide legal services to Florida homeowners for foreclosure related services, and solicits the payment of retainers in violation of Section 877.02, Florida Statutes. Featheringill Decl., Ex. 1; Stephens Transcript, Ex. 3 at 14, 17, 56-57, 68; Bryant Decl. Ex. 16 ¶ 26; *see also generally* Hanson Decl., Ex. 14. Harper's violation of the AVC is prima facie evidence of a FDUPTA violation under Section 501.207, Florida Statutes.

Defendants Harper and Willcox also violated FDUTPA and engaged in unfair, unethical, and unscrupulous conduct when they falsified information on the telemarketing license application they filed on behalf of File Intake Solutions with the Florida Department of Agriculture and Consumer Services, and failed to attach copies of all telemarketing scripts the company was using. Featheringill Decl., Ex. 1, Attach. K. This conduct is actually a felony under Florida law, Section 501.623(4), Florida Statutes, offends established public policy,[7] and is substantially injurious to consumers, as well as other licensed telemarketers.

### e. The HLG Enterprise's deception also amounts to theft.

Under Florida law, a "person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to either temporarily or permanently: (a) deprive the other person of a right to the property or a benefit from the property; (b) appropriate the property to his or her own use or to the

---

[7] *See* Section 501.602, Florida Statutes, which states that the Florida Telemarketing Act serves to "promote the general welfare of the public and the integrity of the telemarketing industry."

use of any person not entitled to the use of the property." Section 812.014, Florida Statutes. "Obtains or uses [includes] obtaining property by fraud, willful misrepresentation of a future act, or false promise." Section 812.012(3)(c), Florida Statutes; *see also State v. Hurley,* 676 So.2d 1010 (Fla. 2d DCA 1996).

In order to prevail on a civil theft count, all elements of theft must be proved, but a criminal conviction for theft is not necessary and the standard of proof is "clear and convincing," not "beyond a reasonable doubt." *Senfeld v. Bank of Nova Scotia,* 450 So. 2d 1157 (Fla. 3d DCA 1984). Intent to commit theft may be proved by circumstantial evidence, *Brewer v. State,* 413 So. 2d 1217 (Fla. 5th DCA 1982), and an effort to conceal or prevent the owner from discovering the theft or giving evasive answers when questioned about it is evidence of intent to commit a theft. *Long v. State,* 1866 WL 1110 (Fla. 1866).

The mere fact that a contractual relationship existed between the parties is not a defense to civil theft. *Masvidal v. Ochoa,* 505 So. 2d 555 (Fla. 3d DCA 1987). When there is a contractual relationship between the parties "an intricate and sophisticated scheme of deceit and theft" is evidence of a civil theft. *Trend Setter Villas of Deer Creek v. Villas on the Green, Inc.,* 769 So.2d 766, 767 (Fla. 4th DCA 1990). Furthermore, partial performance under a contract does not preclude a finding of the intent to commit a theft. *Henry v. State,* 133 So. 3d 1034 (Fla. 4th DCA 2014).

The HLG Enterprise knowingly obtained money from its clients through fraud and willful misrepresentation of the benefits of participation in the mass-joinder lawsuits and misrepresenting what clients were paying for. The HLG Enterprise obtained payments with the intent to deprive the clients of their money, and these monies have been appropriated to Harper, Willcox, Hoffman, and other persons not entitled to the these funds.

As a matter of practice, HLG intake staff makes numerous false claims to potential clients about the likely outcome of the litigation in order to induce them to sign up for participation in the mass-joinder litigation. Consumers sign up as clients based on the Defendants' false promise that participation in the litigation will enable them to receive loan modifications and/or help them avoid or stop foreclosure proceedings. HLG intake representatives tout a high record of success in obtaining beneficial mortgage modifications for its clients, although HLG did not, as a matter of

practice, engage in any such negotiations with lenders. Bryant Decl., Ex. 13 at ¶¶ 37-41. Clients who have lost their homes to foreclosure are told that they will receive monetary damages based upon the fair market value of their homes, but this relief has not even been sought in any of the mass-joinder complaints filed. Stephens Transcript, Ex. 3 at 86-87.

Some files of paying HLG clients indicate that no substantive work has been done, even though the company is collecting monthly fees to pursue their cases. Bryant Decl., Ex. 13 at ¶ 7. HLG also knowingly accepted payment from consumers who would not be eligible for the purported relief HLG was offering even if HLG had provided the services it promised. *Id.* at ¶ 44; Stephens Transcript, Ex. 3 at 88-89. Other consumers were told that, if they paid the retainer in one or two payments, they would be "VIP clients," which would expedite their cases. In reality, VIP clients' cases were not processed any faster, but they would end up paying more monthly fees than regular clients. Bryant Decl., Ex. 13 at ¶ 50.

Clients who threaten to stop paying monthly maintenance fees are told that HLG will not add them to a lawsuit, or will remove them as plaintiffs if an action was already filed, if continuing payments are not made, and they will therefore miss out on the positive relief sought in the actions. This was untrue, however, as no clients were removed for nonpayment of monthly fees. *Id.* at ¶ 55. Instead, HLG collections staff periodically contacts nonpaying clients to try to convince them to make a payment. Collections staff attempts to coerce whatever payment they can out of a client who claimed the monthly fees were unaffordable. *Id.* at ¶ 56. Nonpaying clients were not removed as plaintiffs in a mass-joinder case in an effort to hide the scheme from the courts in which they were filed, as HLG may have been required to explain its scheme to the court in order to remove individual plaintiffs from a multi-plaintiff lawsuit.

The fact that the mass-joinder cases are routinely filed and dismissed is part of a scheme to attempt to continue to collect monthly maintenance fees from the clients under the false premise that services are being provided. At least after the first few mass-joinder complaints were dismissed, Defendants were on notice that the litigation could not proceed as originally pitched to the clients. Instead of accurately informing the clients of the repercussions of dismissal of their respective cases and giving the client the opportunity to continue the litigation, the HLG Enterprise minimized the effects

24

dismissal had on the clients' cases so as to not make them apprehensive about continuing to pay the monthly maintenance fees. Stephens Transcript, Ex. 3 at 48, 65, 66, 93, 106, 109. Additionally, the HLG Enterprise has not altered its sales pitch to prospective clients: they continue to tout their successes at obtaining loan modifications and leading prospective clients to believe that mass-joinder lawsuits have a high likelihood of success.

The HLG Enterprise's practices of routinely misleading consumers, saying and doing whatever it took in order to collect a fee, knowing that the information was false or not substantiated, combined with the fact that no relief was actually being obtained as promised shows that the Enterprise's sole intent, and the purpose of its existence, is to obtain money from its clients which is then appropriated to the defendants and others not entitled to it through fraud and deception.

### 2.  Irreparable injury is likely without an injunction.

There is a likelihood of irreparable injury if the Court does not issue the injunction. In law enforcement actions such as this one—as opposed to matters between private litigants—irreparable injury is presumed where an injunction is authorized by statute, the statutory conditions are satisfied, and the injunction is sought by the agency to which enforcement has been entrusted. *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984) citing *U.S. v. Hayes Int'l. Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969). "[I]rreparable injury should be presumed from the very fact that the statute has been violated." *Id.*

In this case, the CFPA authorizes an injunction, the Defendants are subject to the CFPA, and the Bureau, as the agency charged with enforcing the CFPA, along with the State of Florida, which is also authorized to enforce Regulation O, seek an injunction to protect consumers from acts prohibited by the Bureau's regulations.

Even without the presumption, the plaintiffs meet the irreparable injury test: Those consumers whom the plaintiffs are charged with protecting are likely to suffer irreparable injuries because the defendants' conduct is ongoing, and thus, consumers continue to lose money and their homes due to the HLG Enterprise's scheme. Moreover, in the absence of an injunction, the defendants are likely to dissipate or conceal assets, which would have the irreparable injury of hindering this Court's ability to secure effective final relief. *See* Section V.E. *infra*.

### 3.  The balance of hardships and the public interest support a TRO.

The third and fourth factors in the issuance of a TRO, the balance of hardships and the public interest, overwhelmingly favor the plaintiffs. On the one side is the ongoing harm to the public interest and to the HLG Enterprise's victims if the TRO is not issued and the defendants continue to violate the law. To begin, when a court balances the hardships of the public interest (here, the plaintiffs) against the private interest (here, the defendants), "the public interest should receive greater weight." *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989); *see also FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1030 (7th Cir. 1988).

Indeed, there is a strong public interest in the prompt and effective enforcement of the law. *FTC v. University Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991). Moreover, Congress made clear that stopping violations of Regulation O are in the public interest: The Bureau's statutory mandate specifically includes protecting consumers from deceptive mortgage assistance relief service providers and ensuring that such providers comply with Regulation O. *See supra* Part II. The public has an interest in halting mortgage relief scams and being protected from further harm resulting from the HLG Enterprise's sham businesses. Here, an injunction is authorized by a statute of the United States and will serve to enforce and implement congressional policy; thus, it is in the public interest to issue one.

Moreover, the public interest demands that the defendants' scam be stopped and their assets be preserved to redress harmed consumers. *See FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999) ("The public interest in preserving the illicit proceeds of the … scheme for restitution to the victims is great"). Freezing the defendants' access to their ill-gotten gains in order to preserve these assets for giving redress to injured consumers also furthers the public interest, and the likely dissipation or concealment of those assets would harm the plaintiffs and the consumers this action is intended to help. *See FTC v. IAB Marketing Associates*, 972 F.Supp.2d 1307, 1312-13 (S.D. Fla. 2013).

Weighing against this, the defendants continue to harm consumers every day and have no legitimate interest in continuing their unlawful conduct. *See World Wide Factors*, 882 F.2d at 347 ("[T]here is no oppressive hardship to defendants in requiring

them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment"). If the TRO is issued, the defendants will lose immediate access to their ill-gotten gains and their ability to make money through continuing to violate the law. But this is not a true hardship, for defendants have no legitimate interest in receiving continued gain from violating the law, *FTC v. USA Beverages*, 2005 WL 5654219 at \*7-8 (S.D. Fla. Dec. 6, 2005) adopted 2005 WL 5643834 (S.D. Fla. Dec. 9, 2005),  least of all through a scam as pernicious as these particular defendants'.

At bottom, as the Southern District of Florida has said, the "equities of protecting the public and remedying injury outweigh the non-existent equity of allowing defendants to resume their scam." *Id*. The balance of hardships and the public interest thus favor the plaintiffs because they seek to protect the public by putting an immediate halt to the HLG Enterprise's continuing harm and returning to consumers the money they lost.

### C. Corporate Defendants are liable as a common enterprise.

Corporate defendants are jointly and severally liable when, considering "the pattern and framework of the whole enterprise," there is evidence of a common enterprise between them. *Del. Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964); *see also CFTC v. Wall Street Underground*, 281 F. Supp. 2d 1260, 1271 (D. Kan. 2003), citing *Sunshine Art Studios, Inc. v. FTC*, 481 F.2d 1171, 1175 (1st Cir. 1973) ("Where one or more corporate entities operate in a common enterprise, each may be held liable for the deceptive acts and practices of the other"). When determining whether a common enterprise exists, courts look to a variety of factors, including (1) common control; (2) the sharing of office space and officers; and (3) the commingling of corporate funds and failure to maintain separation of companies. *FTC v. Wolf*, 1996 WL 812940 (S.D. Fla. Jan. 31, 1996).

In this case, the HLG Enterprise operates as a classic common enterprise, with Harper, Willcox, and Hoffman at the center of the scheme. The enterprise commingles finances, has a common address, and shares employees. In so doing, the enterprise does not recognize corporate formalities, but rather the corporate entities act as one organization with the singular purpose of defrauding consumers.

Harper and Willcox are the corporate officers of and signatories to the bank accounts of all the corporate Defendants. Featheringill Decl., Ex. 1 ¶¶ 3-4; Hanson Decl., Ex. 14 ¶¶ 6-7. Hoffman is the corporate officer, managing partner, and signatory to the bank accounts of the central business in the scheme, HLG. Featheringill Decl., Ex. 1 ¶¶ 3-4; Godard Decl., Ex. 4, Attach. A; Hanson Decl., Ex. 14 ¶ 8. Additionally, the corporations in this case all operate out of the same building, with employees coming and going between their various suites multiple times per day. Stephens Transcript, Ex. 3 at 99; Bryant Decl., Ex. 13 ¶ 18. Hoffman, for example, though only technically affiliated with HLG, has had his office in the suite occupied by File Intake Solutions and Legal Intake Solutions. *Id.* Further demonstrating the unity of the businesses, Nationwide Management Solutions has paid the rent for other companies in the enterprise, Hanson Decl., Ex. 14 ¶ 12, and Legal Intake Solutions is the tenant on the lease for every single suite that the enterprise uses. Rosario Decl., Ex. 2, Attach. C.

The companies also regularly share employees. Hanson Decl., Ex. 14 ¶ 13. For example, at least nine employees receive paychecks from multiple companies in the enterprise including some that have received paychecks from all three of Legal Intake Solutions, Nationwide Management Solutions, and the Hoffman Law Group. *Id.* Moreover, the intake companies' only apparent client is HLG. *See generally* Stephens Transcript, Ex. 3; Bryant Decl., Ex. 13 ¶ 16; Hanson Decl., Ex. 14 ¶ 16. Therefore, the corporate defendants are liable as a common enterprise.

### D. Defendants Harper, Willcox, and Hoffman are also individually liable.

The individual defendants are each liable here for their own direct violations of Regulation O. They are also liable for the enterprise's violations because of the management they exerted over, their material participation in, and their knowledge of, the HLG Enterprise's violations.

### 1. The Individual defendants are liable for their own direct violations of Regulation O.

Regulation O applies to any person, corporate or natural, who "provides, offers to provide, or arranges for others to provide any mortgage assistance relief service." 12 C.F.R. § 1015.2; *see also supra* Part V.B.1.a. In this case, Harper, Willcox, and Hoffman

are engaged in providing, offering to provide *and* arranging for others to provide mortgage assistance relief services.

Each of the individual defendants is individually liable because he personally interacts with consumers in order to convince those consumers to pay fees to the HLG Enterprise on the promise of easing their mortgage payments, Stephens Transcript, Ex. 3 at 17-18, 21-22; Featheringill Decl., Ex. 1 Attach. H ¶ 4; Bryant Decl., Ex. 13 ¶ 25, and has received the proceeds of those payments, Hanson Decl., Ex. 14 ¶ 18, thus violating Regulation O's prohibition on "request[ing] or receiv[ing]" an advance fee. 12 C.F.R. § 1015.5(a).

### 2. The individual defendants are liable for the HLG Enterprise's violations of Regulation O.

Each of the individual defendants is also liable for the acts of the enterprise. Courts have not yet articulated a standard for individual liability for corporate violations of Regulation O, but both the CFPA and case law interpreting individual liability under the Federal Trade Commission Act ("FTC Act") support a finding that Harper, Willcox, and Hoffman are liable.[8] The CFPA provides that "related persons" are deemed "covered persons" subject to the CFPA's prohibition of unfair, deceptive or abusive acts or practices. 12 U.S.C. §5481(25)(B). Related persons, in turn, are defined to include those who "materially participate" in the conduct of an entity's affairs and those "charged with managerial responsibility for" an entity. *See* 12 U.S.C. § 5481(25)(C). Similarly, courts hold individuals liable for the acts of corporations under the FTC Act when the individuals have (1) "participated directly" in the corporation's acts or had the "authority to control" them, and (2) knew of, or were recklessly indifferent to, the acts. *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 470 (11th Cir. 1996).

Here, the individual defendants participated in, controlled, and had knowledge of the enterprise's actions. First, each is formally a corporate officer of at least one of the businesses involved in the HLG Enterprise and signatory to multiple bank accounts belonging to the HLG Enterprise. Featheringill Decl., Ex. 1 ¶¶ 3-4; Hanson Decl., Ex. 14 ¶¶ 6-8. And the enterprise's sole function is to provide mortgage assistance relief

---

[8] Notably, a violation of Regulation O is treated as a violation of a rule prohibiting unfair, deceptive, or abusive acts or practices issued under the CFPA and a rule regarding unfair or deceptive practices under the FTC Act. 12 U.S.C. § 5538. The principles of individual liability applicable under those statutes should apply here too.

services. *See* Stephens Transcript, Ex. 3; Bryant Decl., Ex. 13 ¶¶ 12-16; Hanson Decl., Ex. 14 ¶ 16.

The individual defendants also materially participated in the conduct of the enterprise's affairs, including the initial development and approval of the purported mortgage assistance relief services that the HLG Enterprise offers. As noted above, each of the individual defendants personally interacts with consumers in order to convince consumers to pay fees to the HLG Enterprise on the promise of easing their mortgage payments. Stephens Transcript, Ex. 3 at 17-18, 21-22. The individual defendants' material participation is further demonstrated by their individual roles. Harper, for instance, has "the final [say] on everything." Stephens Transcript, Ex. 3 at 15; *see also* Soave Decl., Ex. 12 ¶ 14; Bryant Decl., Ex. 13 ¶¶ 19-26. Willcox also has a high-level management role in the enterprise. *See* Rosario Decl., Ex. 2, Attach. F; Bryant Decl., Ex. 13 ¶¶ 27-29. And Hoffman, who is also senior management, acts as the attorney of record in at least thirteen of HLG's mass-joinder lawsuits. Bryant Decl., Ex. 13 ¶ 30; List of Known HLG Cases, Ex. 9.

The evidence thus demonstrates that the individual defendants each had managerial responsibility for and materially participated in the conduct of the enterprise's affairs, including the development, approval, and implementation of the purported mortgage assistance relief services complained of herein. And because the enterprise's affairs in this case consisted entirely of the unlawful conduct at issue, the individual defendants also had knowledge of that unlawful conduct. Accordingly, they should be held individually liable for the enterprise's violations of Regulation O, in addition to their own personal violations.

### E. An *ex parte* TRO freezing the defendants' assets and appointing a temporary receiver is necessary to prevent the likely dissipation of assets and to preserve funds for effective final relief for consumers.

The HLG Enterprise's deceptive practices should be immediately halted. In order to preserve assets and evidence and to immediately halt the HLG Enterprise's illegal conduct, the plaintiffs seek an *ex parte* TRO and request that the Court freeze defendants' assets, appoint a temporary receiver, and grant immediate access to the HLG Enterprise's business premises. This relief would stop further harm to members of the public and is necessary to preserve the *status quo*.

As discussed above, the CFPA authorizes this Court to grant the relief sought here, including restitution, disgorgement of ill-gotten gains, and limits on the activities or functions of a defendant. 12 U.S.C. §§ 5564(a), 5565(a)(2). Once the Bureau invokes a court's equitable powers, the full breadth of the court's authority is available, including the power to grant such additional preliminary relief as is necessary to preserve the possibility of providing effective final relief. *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112-13 (9th Cir. 1982). When the public interest is at stake, as here, the exercise of the court's broad equitable authority is particularly appropriate. *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (when the public interest is implicated, the court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake"); *AT&T Broadband v. Tech Commc'ns, Inc.*, 381 F.3d 1309, 1316 (11th Cir. 2004).

In similar FTC actions, courts, including in the Eleventh Circuit, have granted a variety of provisional remedies, including a TRO, preliminary injunction, asset freeze, immediate access, and appointment of a receiver. *See, e.g., World Wide Factors*, 882 F.2d at 346 (TRO, preliminary injunction, asset freeze); *World Vacation Brokers, Inc.*, 861 F.2d at 1021 (TRO, preliminary injunction, asset freeze); *FTC v. U.S. Oil and Gas Corp.*, 748 F.2d 1431, 1432 (11th Cir. 1984) (TRO, preliminary injunction, asset freeze, and appointment of a receiver). In addition, many courts, including in the Eleventh Circuit and this district, have granted such relief on an *ex parte* basis. *See, e.g., Affordable Media*, 179 F.3d at 1232 & n.2 (*ex parte* TRO, asset freeze, financial reporting, preliminary injunction); *FTC v. McGregor v. Chierico*, 206 F.3d 1378, 1381 (11th Cir. 2000) (*ex parte* TRO, asset freeze, appointment of a receiver). And the same relief as that sought here has been granted to the Bureau in the two previous instances the Bureau has requested, both of which involved similar mortgage modification scams. *CFPB v. Gordon*, No. CV12-06147 (C.D. Cal Nov. 16, 2012); *CFPB v. Jalan*, No. CV12-02088 (C.D. Cal. Dec. 14, 2012). State and federal courts also regularly grant the state of Florida similar relief in similar actions. *E.g., Office of Atty. Gen. v. Hess, et al.*, Case No. 08-007686 (Fla. 17th Cir. Ct. Feb. 21, 2008).

### 1. This case warrants *ex parte* relief.

*Ex parte* relief is warranted in this case to ensure that defendants' assets are preserved for consumers' redress and to protect consumers from further injury. *See* Fed.

R. Civ. P. 65(b). A TRO may issue without notice to the adverse party if "immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." *Id.* An *ex parte* TRO serves the "underlying purpose of preserving the status quo and preventing irreparable harm." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameida Cnty.*, 415 U.S. 423 (1974); *Abercrombie & Fitch Trading Co. v. 7starzone.com*, 2014 WL 352184 (S.D. Fla. Jan. 31, 2014). Courts grant *ex parte* TROs in two circumstances applicable here: (1) likely dissipation or concealment of assets and (2) likely disregard of a court order. *Gucci America, Inc. v. Guodong Zhou*, 2011 WL 3651030 (S.D. Fla. Aug. 18, 2011) (likely dissipation of assets); *CFTC v. First Bristol Grp., Inc.*, 2002 WL 31357411 (S.D. Fla. Aug. 20, 2002) (same); *Dell Inc. v. BelgiumDomains, LLC*, 2007 WL 6862342 at *13 (S.D. Fla. Nov. 21, 2007) (likely disregard of a court order).

*Ex parte* relief is appropriate in this case for both of these reasons. First, the defendants are likely to dissipate or conceal assets if they receive notice before an order is entered. The defendants freely move money between their various entities and use money in their business accounts for apparently personal items such as car leases, car washes, and meals at restaurants, and they have spent thousands on their American Express cards. Hanson Decl., Ex. 14 ¶ 15; *see also supra* Section IV.C; *infra* SectionV.E.2.

Second, it is likely that the defendants will disregard a court order since they have continued to operate their scheme in the face of state orders. HLG has continued to operate in New Mexico even after receiving a Cease and Desist Order from the office of the New Mexico Attorney General. That Order, which specifically referenced violations of Regulation O, was issued on July 5, 2013, Rosario Decl., Ex. 2, Attach. B, but HLG has continued doing business with New Mexico consumers at least into early 2014. *See generally* Solis Decl., Ex. 6. HLG is also subject to a Cease and Desist Order from the Idaho Department of Financial Institutions. Rosario Decl., Ex. 2, Attach. C.

Additionally, Willcox and Harper were both personally involved in a company called Loan Solutions, which later entered into a consent judgment with the Florida Attorney General "relating to charging upfront fees for loan modifications and foreclosure-related rescue services." Hanson Decl., Ex. 14 ¶ 14; Loan Solutions Consent Judgment, Ex. 15.

And crucially, as described above, Harper set up the HLG Enterprise after he entered into an Assurance of Voluntary Compliance with the Office of the Florida Attorney General relating to his prior foreclosure-rescue scam. Exhibit 1 to Plaintiffs' Complaint. Moreover, Harper lied about this AVC on his application for File Intake Solutions' telemarketing license, further demonstrating his flagrant disregard for the law. Featheringill Decl., Ex. 1, Attach. K.

### 2. The Court should freeze the defendants' assets.

The plaintiffs seek restitution for the victims of the HLG Enterprise's illicit scheme. To preserve the possibility of such relief, the plaintiffs ask the Court to freeze the defendants' assets and to order an immediate accounting to prevent concealment or dissipation of assets pending a final resolution. In cases such as this, where the plaintiffs establish that they are likely to succeed on the merits and the defendants are likely to dissipate assets, an asset freeze is appropriate. *CFTC v. Offshore Financial Consultants of Fla., Inc.*, 2002 WL 1788031 at *1 (S.D. Fla. June 5, 2002). And where the plaintiffs are likely to succeed in showing that an individual is liable, the freeze should extend to individual assets as well. *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005); *FTC v. Home Assure, LLC*, 2009 WL 1043956 at *1, *5-*6 (M.D. Fla. Apr. 16, 2009).

An asset freeze is appropriate here to preserve the status quo, ensure that funds are not dissipated during the course of this action and preserve assets for consumer redress. The HLG Enterprise's practices have garnered dozens of consumer complaints and drawn the attention of other state law enforcement authorities in addition to the plaintiffs. *See supra* Part V.E.1. Furthermore, defendants who have engaged in deception may be considered likely to waste assets prior to resolution of the action. *See SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972). And, as previously discussed, the contents of the HLG Enterprise's business bank accounts are repeatedly depleted as a result of the defendants' regular use of them as their personal accounts. *See supra* Parts IV.C. and V.E.1. An asset freeze is therefore necessary to preserve the funds derived from the HLG Enterprise's illegal activities and prevent the defendants' continued misuse of consumers' money.

### 3.  The Court should appoint a temporary receiver.

As also addressed in the Application for Appointment of Receiver , filed concurrently with this Motion, the appointment of a temporary receiver for the HLG Enterprise is critical. In cases where a corporate defendant, through its management, has deceived members of the public, "it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste" to the detriment of the deception's victims. *SEC v. First Fin. Grp.*, 645 F.2d 429, 438 (5th Cir. 1981). In similar FTC enforcement actions, courts frequently appoint temporary receivers for corporate defendants that have used deception to obtain money from consumers. *FTC v. Home Assure, LLC*, 2009 WL 1043956 at *1 (M.D. Fla. Apr. 16, 2009); *FTC v. FTN Promotions, Inc.*, 2008 WL 151888 at *5 (M.D. Fla. Jan. 15, 2008); *FTC v. Transnet Wireless Corp.*, 506 F.Supp.2d 1247, 1251 & n.3 (S.D. Fla. 2007); *FTC v. USA Beverages, Inc.* 2005 WL 5654219 at *1 (S.D. Fla. Dec. 6, 2005); *FTC v. Jordan Ashley, Inc.*, 1994 WL 200775 at *1 (S.D. Fla. Apr. 5, 1994).

Appointment of a receiver is particularly appropriate here because the HLG Enterprise's deceptive scheme demonstrates such an indifference to the law that both the individuals and the corporations may reasonably be expected to frustrate the plaintiffs' law enforcement efforts by destroying evidence and concealing or dissipating assets. A receiver can monitor the use of defendants' assets, marshal and preserve records, identify assets, identify and segregate any attorney-client privileged materials, determine the size and extent of the enterprise, identify additional consumers who were injured, and repatriate foreign assets. Moreover, in light of the defendants' persistent and knowing violations, as discussed above, appointment of a receiver is a reasonable way for the Court to ensure that the defendants cease their unlawful conduct and to preserve their assets pending a permanent resolution of this case.

The plaintiffs recommend that the Court appoint Mark Bernet of Akerman, LLP as temporary receiver for the corporate defendants. In the alternative, if the Court would prefer a list of potential receivers, the plaintiffs will provide such a list. Mr. Bernet's qualifications are set forth in the plaintiffs' Application for a Temporary Receiver, filed separately with this Motion.

## VI.    CONCLUSION

The HLG Enterprise has caused and likely will continue to cause substantial public injury by violating Regulation O, the FDUTPA, and other state laws. The plaintiffs thus respectfully request that the Court enter the proposed TRO, on an *ex parte* basis, in order to protect the public from further harm and help ensure effective relief for those harmed. The plaintiffs further request that the Court order the defendants to show cause why a preliminary injunction should not also be issued.

Dated: July 14, 2014                                   Respectfully Submitted,

Attorneys for Plaintiff
Consumer Financial Protection Bureau:

Anthony Alexis, DC Bar #384545
Acting Enforcement Director

Ori Lev, DC Bar #452565
Deputy Enforcement Director

Laurel Loomis Rimon, CA Bar #166148
Assistant Litigation Deputy

Zach Mason, WA Bar #47202
S.D. Fla. Special Bar #A5501978
(Email: zach.mason@cfpb.gov)
(Phone: 202-435-7508)
Nelle Rohlich, WI Bar #1047522
S.D. Fla. Special Bar #A5501979
(Email: nelle.rohlich@cfpb.gov)
(Phone: 202-435-7280)
1700 G Street NW
Washington, DC 20552
Fax: 202-435-7722

And

Attorneys for Plaintiff
The State of Florida,
Office of the Attorney General
Department of Legal Affairs

35

Pamela Jo Bondi
Attorney General

Victoria A. Butler
Attorney Supervisor/Bureau Chief

Richard Schiffer, FL Bar #74418
richard.schiffer@myfloridalegal.com
Amanda Arnold Sansone, FL Bar # 587311
amanda.sansone@myfloridalegal.com
3507 East Frontage Road #325
Tampa, Florida 33607
Phone: 813-287-7950
Fax: 813-281-5515

36