## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 14-80931-CIV-COHN-SELTZER

CONSUMER FINANCIAL PROTECTION
BUREAU and THE STATE OF FLORIDA,
Office of the Attorney General,
Department of Legal Affairs

      Plaintiffs,

v.

MICHAEL HARPER, an individual; BENN
WILLCOX, an individual; MARC HOFFMAN,
an individual; THE HOFFMAN LAW GROUP,
P.A. f/k/a THE RESIDENTIAL LITIGATION
GROUP, P.A., a Florida corporation;
NATIONWIDE MANAGEMENT SOLUTIONS,
LLC, a Florida limited liability company;
LEGAL INTAKE SOLUTIONS, LLC, a Florida
limited liability company; FILE INTAKE
SOLUTIONS, LLC, a Florida limited liability
company; and BM MARKETING GROUP,
LLC, a Florida limited liability company,

      Defendants.

### DEFAULT JUDGMENT AND ORDER
### AS TO CORPORATE DEFENDANTS

Plaintiffs, the Consumer Financial Protection Bureau ("CFPB" or "Bureau") and the State

of Florida ("Florida"), commenced this civil action on July 14, 2014, pursuant to: (1) Sections

1054 and 1055 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5564,

5565; (2) Section 626 of the Omnibus Appropriations Act of 2009, as amended by Section 1097

of the CFPA, 12 U.S.C. § 5538, and the Mortgage Assistance Relief Services Rule, 12 C.F.R. Part 1015 ("Regulation O"); (3) the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Chapter 501, Part II, Florida Statutes; and (4) Florida's Civil Theft Law, Sections 812.035(5), 812.014, Florida Statutes. On that date, Plaintiffs filed a Complaint for Permanent Injunction and Other Relief ("Complaint"), seeking preliminary and permanent injunctive relief, rescission or reformation of contracts, the refund of monies paid, restitution, disgorgement of ill-gotten monies, civil money penalties, and other equitable relief for Defendants' acts or practices related to the marketing and sale of mortgage assistance relief services in violation of Regulation O, FDUTPA, and Florida's Civil Theft Law. Compl., DE 4.

On July 16, 2014, the Court issued an *ex parte* Temporary Restraining Order against the Defendants, which froze the Defendants' assets and placed The Hoffman Law Group (f/k/a The Residential Litigation Group, P.A.) ("HLG"), Nationwide Management Solutions, Legal Intake Solutions, File Intake Solutions, and BM Marketing Group (together, "Corporate Defendants") into receivership. DE 13.

The Corporate Defendants failed to file an answer or otherwise defend in this action, and the Clerk entered default against them on September 12, 2014. DE 71, 72.

The Court approved and entered a preliminary injunction against Corporate Defendants on March 2, 2015. DE 131. The Court approved and entered Stipulated Final Judgments and Orders as to each of the Individual Defendants — Michael Harper, Benn Willcox, and Marc Hoffman — on May 5 and May 6, 2015. DE 139, 140, 144.

The court may enter default judgment when a defendant fails to respond to a complaint and court orders and fails to participate in the litigation or cooperate in good faith with the plaintiff. *Tara Prods., Inc. v. Hollywood Gadgets, Inc.*, 449 F. App'x 908, 910–12 (11th Cir.

2011); *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009); *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987). Default judgment is appropriate here against Corporate Defendants because they have failed to file answers or otherwise appear and defend the claims brought against them. Corporate Defendants' liability is well-pled in the Complaint, and Corporate Defendants have failed to participate in the litigation in good faith. Pursuant to Fed. R. Civ. P. 55(b)(2), upon application by Plaintiffs, the Court now enters a default judgment against Corporate Defendants for violations of Regulation O, 12 C.F.R. Part 1015; FDUTPA, Ch. Part II; and Florida's Civil Theft law, Sections 812.035(5), 812.014, Florida Statutes.

It is therefore **ORDERED, ADJUDGED, AND DECREED** as follows:

## I. Findings

1.      This Court has jurisdiction over the subject matter of this case and over Corporate Defendants pursuant to 12 U.S.C. § 5565(a)(1) and 28 U.S.C. §§ 1331, 1345, and 1367.

2.      Venue in the Southern District of Florida is proper under 28 U.S.C. § 1391(b) and 12 U.S.C. § 5564(f).

3.      Corporate Defendants have been properly served with the Summons and Complaint.

4.      Corporate Defendants have failed to answer or otherwise defend this action.

5.      The Clerk entered defaults against Corporate Defendants on September 12, 2014. DE 71, 72.

6.      The Complaint states a claim upon which relief can be granted.

7.      Because of Corporate Defendants' default, Corporate Defendants are deemed to have admitted the well-pled facts of the complaint and the allegations are taken as true. *Eagle Hosp.*, 515 F.2d at 1307; *Buchanan*, 820 F.2d at 361.

3

8.      Section 1055 of the CFPA, 12 U.S.C. § 5565, as well as Sections 501.207 and 812.035,

Florida Statutes, which this Court has supplemental jurisdiction over pursuant to 28 U.S.C. §

1367, empower this Court to order injunctive and other relief, restitution, and civil money

penalties.

9.      Plaintiffs are entitled to an Order imposing permanent injunctive relief; requiring

Corporate Defendants to make restitution of $11,730,579; and requiring Corporate Defendants to

pay civil money penalties.

10.     This action and the relief awarded herein are in addition to, and not in lieu of, other

remedies as may be provided by law, including both civil and criminal remedies.

*Corporate Defendants Operated as a Common Enterprise*

11.     Corporate Defendants operated as a common enterprise, and are therefore jointly and

severally liable for the misconduct alleged in the Complaint. Plaintiffs alleged that "the

Individual Defendants operated their scheme by using the Corporate Defendants as a common

enterprise." Compl. ¶ 63.

12.     Each corporation existed "to participate in the same mortgage relief operation," with

roles ranging from giving "consumers the impression of a legitimate law firm" to "funnel[ing]

revenue to non-attorneys," to operating the "telemarketing boiler rooms that convince[d]

consumers to pay HLG's fees." Compl. ¶ 64. Corporate Defendants commingled finances; paid

each other's rents; shared a common address; shared employees; and operated under the common

control of the same principals: Harper, Willcox, and Hoffman. Compl. ¶¶ 65–68. Corporate

Defendants "all exist[ed] for the single purpose of selling consumers mortgage assistance relief

services and splitting the profits among the individual defendants." Compl. ¶ 69. None of the

companies had any other business purpose. *Id.*

13.     These facts are borne out through documents and testimony gathered in Plaintiffs'

investigation, and by the Receiver's investigation of Corporate Defendants since his appointment

by the Court. For instance, the Receiver found no evidence of a written contract between

Nationwide Management Services and Hoffman Law Group, or any set fee that was charged by

Nationwide. Receiver's Initial Report at 16, DE 84 (Sept. 18, 2014). Based on extensive

document review and interviews, the Receiver concluded that Corporate Defendants shared

services, were controlled by the same three individuals — Harper, Hoffman, and Willcox — and

were engaged in a single, common business scheme, with no other sources of revenue. *Id.* at 16–

18.

14.     Corporate Defendants operated as a common enterprise in effectuating the alleged

mortgage relief scheme, and are therefore jointly and severally liable for all of the violations

alleged in the complaint. Where one or more corporate entities operate in a common enterprise,

each may be held liable for the deceptive acts and practices of the other. *Sunshine Art Studios,*

*Inc. v. FTC*, 481 F.2d 1171, 1175 (1st Cir.1973); *FTC v. Wolf*, No. 94-8119-CIV-FERGUSON,

1996 WL 812940, \*7–8 (S.D. Fla. Jan. 31, 1996); *Commodity Futures Trading Comm'n. v. Int'l*

*Berkshire Grp. Holdings*, No. 05-61588-CIV-ALTONAGA, 2006 WL 3716390, \*7 (S.D. Fla.

Nov. 3, 2006).

15.     The Court, in its discretion, enters injunctive and monetary relief, without holding an

evidentiary hearing. *Tara Prods., Inc. v. Hollywood Gadgets, Inc.*, 449 F. App'x 908, 911–12

(11th Cir. 2011).

16.     Entry of this Order is in the public interest.

### *Corporate Defendants Violated Regulation O*

### *COUNTS I-IV*

17.     The Complaint contains well-pled factual allegations supporting a finding of liability on
each of these provisions of Regulation O:

      a.  Corporate Defendants offered a service, in exchange for a fee, that purported to assist
          consumers to prevent the foreclosure of their home or to obtain a loan modification
          on their home mortgage. Compl. ¶¶ 2, 28–38, 40–42, 45, 73.

      b.  Corporate Defendants charged consumers a varying upfront fee, which typically
          consisted of a $6,000 initial fee and $495 per month thereafter. Compl. ¶ 46.
          Defendants Harper and Willcox, two of the principals of the HLG Enterprise, both
          admitted to those facts. *See* Defendant Michael Harper's Amended Answer to
          Complaint ¶ 46, DE 91 (Sept. 23, 2014) (admitting the allegations made in Complaint
          ¶ 46); Defendant Benn Willcox's Corrected Amended Answer to Complaint ¶ 46, DE
          97 (Sept. 25, 2014) (same admission).

      c.  The upfront fees were charged before the consumers had executed a written
          agreement with the loan holder or servicer that incorporated the offer obtained by the
          defendants. Compl. ¶¶ 45, 46, 52, 84. Thus, Corporate Defendants' upfront fees
          violated 12 C.F.R. § 1015.5(a).

      d.  In numerous instances, Corporate Defendants "discouraged consumers from
          communicating directly with their lenders or servicers and claimed that they [would]
          handle all communications with consumers' lenders and servicers. Compl. ¶¶ 48, 86.
          Corporate Defendants' representations to consumers about contacting their lenders
          violated 12 C.F.R. § 1015.3(a).

e.  Corporate Defendants made numerous misrepresentations to consumers about material aspects of the defendants' mortgage assistance relief services. Compl. ¶ 88. For instance, in "numerous instances, the HLG Enterprise . . . encouraged consumers to stop making mortgage payments, and in some instances told consumers that delinquency will demonstrate the consumers' hardship to the consumers' lenders." Compl. ¶ 49. Corporate Defendants did "not disclose that if consumers stop[ped] making mortgage payments, they could lose their homes and damage their credit ratings." *Id.*

f.  Corporate Defendants also misrepresented their staffing and the likelihood that their mass-joiner cases would result in the consumer receiving a loan modification with favorable terms. Compl. ¶ 42. These and other material misrepresentations alleged in the Complaint violated 12 C.F.R. § 1015.3(b)(4).

g.  Corporate Defendants' solicitations to consumers failed to state that:

    i.  The consumer may stop doing business with Corporate Defendants or reject an offer of mortgage assistance, if one is made, without having to pay for the services;

    ii.  Corporate Defendants are not associated with the government or approved by the government or the consumer's lender; and

    iii.  Even if the consumer uses the HLG Enterprise's service, the consumer's lender may not agree to modify the loan.

    Compl. ¶¶ 50, 90. Moreover, where any of these disclosures were made, they were not made in a "clear and prominent manner," they were "not preceded by the heading "IMPORTANT NOTICE" or made in the font size required by law. Compl.

¶¶ 51, 90. Thus, Corporate Defendants' failure to provide the required, "clear and prominent" disclosures violated 12 C.F.R. § 12 C.F.R. § 1015.4.

18.     Given these well-pled allegations and Corporate Defendants' failure to answer or defend, the Court exercises its discretion to enter a default judgment against Corporate Defendants for violations of Regulation O. *See, e.g.*, *CFPB v. Jalan*, No. 12-02088 (C.D. Cal. July 23, 2013) (awarding default judgment against a corporation and two individual defendants for violations of Regulation O and other consumer protection laws).

*Corporate Defendants Violated Florida State Laws*

*COUNT V*

19.     The Complaint contains well-pled factual allegations that Corporate Defendants violated FDUTPA. Compl. ¶¶ 96, 98.

20.     Pursuant to Section 501.204(1) of FDUTPA, "unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. Florida follows the "standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts." Section 501.203(3)(b), Florida Statutes. To that end, the Florida Supreme Court has noted a deceptive practice is one which "involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances." *See PNR Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003).

21.     FDUTPA is liberally construed to protect the consuming public from those who engage in deceptive or unfair acts or practices in trade or commerce. *See* Fla. Stat. § 501.202(2).

22.     Whether a representation or practice is deceptive is a matter of judicial determination. *Dept. of Legal Affairs v. Father and Son Moving & Storage, Inc.* 643 So.2d 22, 26 (Fla. 4th DCA 1994).

23.     To determine whether a representation is deceptive, courts must consider "the impression created by the representation, not its literal truth or falsity." *FTC v. Peoples Credit First, LLC*, 2005 WL 3468588 (M.D. Fla. 2005), aff'd 2007 WL 2071712 (11th Cir. 2007) *(*citing *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496 (1st Cir. 1989) (*quoting Am. Home Prods. Corp. v. FTC,* 695 F.2d 681, 687 (3d Cir. 1982)). Advertising claims are deceptive if they have the capacity to convey misleading impressions to consumers even though non-misleading interpretations may be possible. *Father and Son Moving & Storage,* 643 So.2d at 26.

24.     The facts pled in the Complaint allege that Corporate Defendants utilized false and deceptive statements disseminated through websites, direct mailings, television advertisements, and telemarketing sales presentations to induce consumers to pay advance fees, typically in the amount of $6000, plus monthly fees of $495 to participate in the purported mass-joinder litigation against mortgage lenders. Compl. ¶¶ 39-46, 52-56, 96.

25.     Corporate Defendants led consumers to believe that the mass-joinder litigation had a high likelihood of success, and that plaintiffs in the litigation were likely to receive relief including favorable modifications of the terms of their mortgage, reductions in principal and interest rates, and even recover punitive damages against the lenders. Compl. ¶¶ 41, 42, 45, 53.

26.     Through the various methods of sales presentations employed, Corporate Defendants led consumers to believe that HLG was staffed with experienced, competent attorneys who had significant experience in complex tort litigation, and that the attorneys had spent, and would continue to spend, a significant amount of time researching, planning, and pursuing each individual client's claims in the proposed mass-joinder litigation. Compl. ¶¶ 41, 42, 96.

27.     Although litigation was eventually filed on behalf of some clients by other law firms that were hired by Corporate Defendants, the pleadings filed were facially insufficient to obtain the

relief promised to HLG clients, and Corporate Defendants did nothing to move the cases forward once filed. Compl. ¶¶ 53, 56. This was because Corporate Defendants, including the law firm HLG, were controlled mostly by the non-lawyer Individual Defendants, without significant regard for litigation theories, litigation strategy, or even a sound legal basis upon which the litigation would be brought. Compl. ¶ 97

28.     Corporate Defendants collaborated in a deceptive scheme to first provide potential clients misleading information about the likely outcomes of the proposed litigation, and who would be actually litigating the matter, in order to convince them to sign up and pay the large enrollment fee, then to continue to deceive the clients about the progress of said litigation in order to continue to collect monthly fees from them. Compl. ¶¶ 46, 52-56.

29.     Given these well-pled allegations and Corporate Defendants' failure to answer or defend, the Court exercises its discretion to enter a default judgment against Corporate Defendants for willful violations of FDUTPA, as alleged in Count V by Florida.

### *COUNT VI*

30.     The Complaint contains well-pled factual allegations that Corporate Defendants committed Theft, as defined by Section 812.014, Florida Statutes, and Florida seeks civil remedies pursuant to Section 812.035, Florida Statutes. Compl. ¶¶ 103, 107, 109.

31.     Corporate Defendants knowingly obtained money from HLG clients through fraud and willful misrepresentation of the benefits of participation in the mass-joinder lawsuits and misrepresenting what clients were paying for. Corporate Defendants obtained payments with the intent to deprive the clients of their money, and these monies were appropriated to the Individual Defendants, and other persons. Compl. ¶¶ 42, 45, 46, 52-56, 103-105, 108.

32.     Corporate Defendants made numerous false claims to potential clients about the likely outcome of the litigation in order to induce them to sign up for participation in the mass-joinder litigation. Consumers signed up as clients based on Corporate Defendants' false promises that participation in the litigation would enable them to receive loan modifications and/or help them avoid or stop foreclosure proceedings. Compl. ¶¶ 103, 108.

33.     Corporate Defendants' practices of routinely misleading consumers, saying and doing whatever it took in order to collect a fee, knowing that the information was false or not substantiated, combined with the fact that no relief was actually being obtained as promised, demonstrates that Corporate Defendants' sole intent, and the purpose of their existence, was to obtain money from clients which was then appropriated to Corporate Defendants and others not entitled to it, through fraud and deception. Compl. ¶¶ 103-105, 108.

34.     Given these well-pled allegations and Corporate Defendants' failure to answer or defend, the Court exercises its discretion to enter a default judgment against Corporate Defendants for Theft, as alleged in Count VI by Florida.

### *COUNT VIII*

35.     The Complaint contains well-pled factual allegations that Defendant File Intake Solutions, LLC, falsified or intentionally omitted material information in an application for a Florida commercial telephone seller license, and that doing so violates FDUTPA. Compl. ¶ 126.

36.     A violation of FDUTPA may also be based on a violation of "any law, statute, rule, regulation or ordinance which proscribes . . . unfair, deceptive, or unconscionable acts or practices." Section 501.203(3)(c), Florida Statutes.

37.     Defendant File Intake Solutions, LLC, filed an application with the Florida Department of Agriculture and Consumer Services in 2013 for licensure as a commercial telephone seller, pursuant to Section 501.605, Florida Statutes. Compl. ¶ 120.

38.     The application contained several incorrect answers to certain questions, and information was intentionally omitted from other answers, to questions relating to the business activities of File Intake Solutions, as well as the previous activities of Individual Defendants Benn Willcox and Michael Harper. Compl. ¶ 121.

39.     In general, a state has the power to regulate and license certain activities for the purpose of protecting its citizens, and to ensure that businesses do not act in a manner detrimental to the public interest. *See, e.g., United Enterprises v. Dubey*, 128 F. 2d 843 (5th Cir. 1942).

40.     Falsifying or omitting material information on an application for a professional license creates an unfair advantage over other businesses that are in compliance with the law, offends established public policy, and is substantially injurious to consumers, as well as competitors, and is therefore a violation of FDUTPA.

41.     Given these well-pled allegations and Corporate Defendants' failure to answer or defend, the Court exercises its discretion to enter a default judgment against File Intake Solutions for willfully violating FDUTPA, as alleged in Count VIII by Florida.

### *DAMAGES*

42.     The proper measure of consumer redress is the total amount consumers paid to purchase goods or services, less refunds already returned. *McGregor v. Chierico*, 206 F.3d 1378, 1389 (11th Cir. 2000); Order, *CFPB v. Jalan*, No. 12-02088, slip op. at 11 (C.D. Cal. July 23, 2013); *FTC v. 1st Guar. Mortg. Corp.*, No. 09-61840-CIV-O'SULLIVAN, 2011 WL 1233207, *22 (S.D. Fla. Mar. 30, 2011); *Wolf*, 1996 WL 812940, *9.

43.     Defendants are liable for the entire amount spent by consumers, regardless of whether consumers received anything of value; the relevant factor is the "fraud in the selling, not the value of the thing sold." *Chierico*, 206 F.3d at 1389 (quoting *FTC v. Figgie Int'l, Inc*., 994 F.2d 595, 606 (9th Cir. 1993)).

44.     Plaintiffs bear the burden of proving damages and may do so through affidavits and other documentary evidence showing the amount and calculation of damages. *Tara Prods.*, 449 F. App'x at 911–12 (11th Cir. 2011).

45.     Plaintiffs have established, through competent evidence, that approximately 2,000 consumers were victimized by and paid money to Corporate Defendants between April 2012 and the end of the scheme.

46.     Plaintiffs have further established, through competent evidence, that the consumer victims of Corporate Defendants' scheme paid at least $12,608,600 over the lifetime of the scheme.

47.     During the same period, consumers received $878,021 in refunds and returns.

48.     As explained in the declaration of Theresa Ridder attached to Plaintiffs' Motion, these figures were derived from Corporate Defendants' records, including QuickBooks accounting records obtained through the TRO, and from the records of the defendants' third-party payment processors and bank statements, obtained through document requests.

49.     The net amount, $11,730,579, represents a reasonable approximation of consumer loss.

50.     Because the five Corporate Defendants operated as a single enterprise for purposes of this illegal scheme, the apportionment of proceeds received by the various entities cannot be determined with any certainty.

13

51.     The Court holds the Corporate Defendants jointly and severally liable for the consumer loss caused by the conduct alleged in the Complaint.

## II. Definitions

52.     The following definitions apply to this Order:

   a.  "Affected Consumer" means any consumer who paid the Defendants or their officers, agents, servants, employees, or attorneys for mortgage assistance relief products or services between April 1, 2012, and the Effective Date.

   b.  "Asset" means any legal or equitable interest in, right to, or claim to any real, personal, or intellectual property owned or controlled by, or held, in whole or in part, for the benefit of, or subject to access by any Corporate Defendant, wherever located, whether in the United States or abroad. This includes, but is not limited to, chattel, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds, contracts, mail or other deliveries, shares of stock, commodities, futures, inventory, checks, notes, accounts, credits, receivables (as those terms are defined in the Uniform Commercial Code), funds, cash, and trusts;

   c.  "Corporate Defendants" means The Hoffman Law Group, P.A. (f/k/a The Residential Litigation Group, P.A.); Nationwide Management Solutions, LLC; Legal Intake Solutions, LLC; File Intake Solutions, LLC; and BM Marketing Group, LLC; and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, successors and assigns.

   d.  "Defendants" means the Individual Defendants and Corporate Defendants, individually, collectively, or in any combination, and each of them by whatever names each might be known, and their successors and assigns.

14

e. "Effective Date" means the date on which this Order is signed by the Court.

f. "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or his or her delegee.

g. "Individual Defendants" means Michael Harper, Benn Willcox, and Marc Hoffman, individually, collectively, or in any combination, and each of them by any other names by which they might be known; and their successors and assigns.

h. "Person" means an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity.

i. "Receiver" means Mark Bernet, Esq., or any person subsequently appointed by this Court as a Receiver in this action.

j. "Receivership Estate" means the Assets held by the Receiver, in whatever form they exist, pursuant to the Court's Orders in this matter.

k. "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against Defendants based on substantially the same facts as described in the Complaint.

l. "Termination Date" means December 31, 2015, unless extended by the Court. The Court may extend the Termination Date if it determines the Receivership needs to continue beyond December 31, 2015 in order to pursue viable claims of the Receivership Estate.

m. The words "and" and "or" will be understood to have both conjunctive and disjunctive meanings as necessary to make the applicable phrase or sentence inclusive rather than exclusive.

## ORDER

### III. Dissolution of Corporate Defendants

53.     The Preliminary Injunction entered against Corporate Defendants dated March 2, 2015, will remain in effect for the duration of the Receivership.

54.     Upon dissolution of the Receivership, the Corporate Defendant entities will be permanently dissolved.

55.     The Florida Department of Agriculture and Consumer Services shall cancel the Commercial Telephone Seller license held by Defendant File Intake Solutions, LLC.

### IV. Order to Pay Redress

**IT IS FURTHER ORDERED** that:

56.     A judgment for equitable monetary relief is entered in favor of the Plaintiffs and against Corporate Defendants, jointly and severally, in the amount of $11,730,579, which represents the monetary value of consumer damages proven through competent evidence.

57.     The Receiver's Third Interim Report (DE 134), filed on April 29, 2015, reports that the balance of funds in the Receivership Estate, less administrative expenses and funds required to pursue additional recoveries, is $655,736.98. Based on that report, Corporate Defendants are ordered to pay $655,736.98 toward the judgment provided for in Paragraph 56. This monetary judgment is enforceable against any Asset owned by, on behalf of, for the benefit of, or in trust by or for, any Corporate Defendant. Due to the cessation of Corporate Defendants' operations and the permanent dissolution of Corporate Defendants, and the fact that the total value of Corporate Defendants' seized and liquidated Assets is insufficient to pay the full amount of relief ordered in Paragraph 56, the remainder of the monetary relief ordered in Paragraph 56 is deemed uncollectable and suspended.

58.    The partial suspension provided in this Section is expressly premised on the truthfulness, accuracy, and completeness of the Receiver's Third Interim Report regarding the balance of funds in the Receivership Estate as of the date of the Third Interim Report. If the Court determines that the Third Interim Report contains any material misrepresentation, omission, or error, then the suspension of the monetary judgment will be terminated, and Plaintiffs can seek to enforce the full monetary judgment entered in Paragraph 56, less any amounts paid under this Section.

59.    Any person that holds Assets of any Corporate Defendant shall turn over such Asset to the Receiver within 10 days of receiving notice of this Order.

60.    Within 10 days of the Effective Date, the Receiver is ordered to pay to the Bureau, by wire transfer to the Bureau or to the Bureau's agent, and according to the Bureau's wiring instructions, $655,736.98, in partial satisfaction of the monetary judgment for equitable monetary relief provided for in Paragraph 56.

61.    Any funds received by the Bureau in satisfaction of this judgment will be deposited into a fund or funds administered by the Bureau or the Bureau's agent according to applicable statutes and regulations to be used for redress for injured consumers, including, but not limited to, refund of moneys, restitution, damages or other monetary relief for Affected Consumers, and for any attendant expenses for the administration of any such redress.

62.    If the Bureau determines, in its sole discretion, that providing redress to consumers is wholly or partially impracticable or if funds remain after the administration of redress is completed, the Bureau, after notifying Florida, may apply any remaining funds toward other equitable relief (including consumer information remedies) as determined to be reasonably related to the allegations described in the Complaint. Any funds not used for equitable relief will

be deposited in the U.S. Treasury as disgorgement. Corporate Defendants will have no right to challenge the choice of remedies under this Section, and will have no right to contest the manner of distribution chosen.

63.     Payment of redress to any Affected Consumer under this Order may not be conditioned on that Affected Consumer waiving any right.

## V. Order to Pay Civil Money Penalties on Federal Claims

### IT IS FURTHER ORDERED that:

64.     Judgment is entered against Corporate Defendants, in favor of Plaintiffs, on Counts I through IV.

65.     Under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in the Complaint, and taking into account the factors in 12 U.S.C. § 5565(c)(3), Corporate Defendants must pay a civil money penalty of $10,000,000 to the Bureau.

66.     The civil money penalty paid under this Section will be deposited in the Civil Penalty Fund of the Bureau as required by Section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

67.     Corporate Defendants must treat the civil money penalty paid under this Section as a penalty paid to the government for all purposes.

68.     If Corporate Defendants receive, directly or indirectly, any reimbursement or indemnification from any source, including, but not limited to, payment made under any insurance policy, or if Corporate Defendants secure tax deductions or tax credits with regard to any federal, state, or local tax, the Receiver, on behalf of Corporate Defendants, must: (a) immediately notify the Enforcement Director in writing, and (b) within 20 days of receiving the funds or monetary benefit, transfer the full amount, less fees approved by the court, of such funds or monetary benefit ("Additional Payment") to the Bureau or to the Bureau's agent

18

according to the Bureau's wiring instructions. The Additional Payment will be applied toward satisfaction of the monetary judgments in this Order.

## VI. State Civil Penalties

69.     Judgment is entered against Corporate Defendants, in favor of Florida, on Count V for willful violation of FDUTPA, for creation and dissemination of false and misleading statements in direct mail pieces, on the Hoffman Law Group website, and during telephone sales presentations.

70.     Corporate Defendants knew or should have known that their conduct violated FDUTPA. The undisputed allegations in the Complaint and competent evidence put forth by Plaintiffs demonstrated that approximately 2,000 clients paid monies to Corporate Defendants based upon their deceptive and misleading practices. Accordingly, a civil penalty of $3,000 per violation is imposed for a total civil penalty of $6,000,000 against Corporate Defendants, jointly and severally.

71.     Judgment is entered against File Intake Solutions, in favor of Florida, on Count VIII for willful violation of FDUTPA for knowingly submitting a false commercial telephone seller license application to the Florida Department of Agriculture and Consumer Services. File Intake Solutions shall pay a civil penalty of $5,000 to the State of Florida, General Revenue Fund for this violation.

## VII.    Additional Monetary Provisions

### IT IS FURTHER ORDERED that:

72.     In the event of any default on Corporate Defendants' obligations to make payment under this Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any

19

outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

73.     Corporate Defendants must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Corporate Defendants.

74.     The Court retains jurisdiction to consider any motion by Plaintiffs for an award of reasonable attorney's fees and costs.

## VIII.  Cooperation with the Plaintiffs

### IT IS FURTHER ORDERED that:

75.     The Receiver is directed to cooperate fully to help the Plaintiffs to determine the identity and location of, and the amount of injury sustained by, each Affected Consumer.

## IX. Liquidation of Receivership Assets and Other Matters Related to the Receivership

### IT IS FURTHER ORDERED that:

76.     The Receiver is directed to liquidate all remaining Assets of Corporate Defendants.

77.     Within 30 days from the Effective Date, the Receiver will make available to the Bureau all documents containing information regarding consumer payments made to Defendants.

78.     By November 1, 2015, the Receiver will file an interim report disclosing all Assets of the Receivership Estate and the value of said property; the amount of Receiver's fees and expenses, including any outstanding fees and expenses to be paid from the Receivership Estate; any outstanding claims or judgments of the Receivership or Corporate Defendants and the expected date of payment on those claims, if any; and the amount of money and time needed for the Receiver to collect on any outstanding claims or judgments ("Interim Report"). The Interim Report will inform the Court whether the Receivership needs to continue to exist beyond

20

December 31, 2015, to pursue viable claims. If the Receiver believes that viable outstanding claims of the Receivership Estate will not be resolved by December 31, 2015, the Receivership will move for the Court for an appropriate extension of the Termination Date.

79.     The Receiver is directed to continue to pursue viable Assets of the Receivership until the Termination Date.

80.     On the Termination Date, the Receiver will pay any remaining funds in the Receivership Estate, less the Receiver's proposed reasonable fees and costs, to Plaintiffs toward any unpaid penalties and fees set forth in this Order. The payment will be made in accordance with instructions provided by Plaintiffs.

81.     On the Termination Date, the Receiver shall file and serve on the parties a report and accounting ("Final Report"). The Final Report must include an accounting of Corporate Defendants' finances and total Assets. Included with the Final Report, the Receiver shall file its final application for payment of fees and expenses associated with its performance of its duties as a Receiver.

82.     Ten days after the Termination Date, the Receiver will submit to the Court the Final Report and any objections to the report and the Court will determine if it should issue an order directing that the Receiver:

a. Pay the reasonable costs and expenses of administering the Receivership pursuant to the Receiver's application for payment of costs and expenses; and

b. To the extent that funds remain, remit such funds to the Bureau within ten days by wire transfer to the Bureau or to the Bureau's agent, and according to the Bureau's wiring instructions.

21

83.     Until the Termination Date, if there is any final judgment, consent order, or settlement in

a Related Consumer Action, the Receiver must notify the Enforcement Director of the final

judgment, consent order, or settlement in writing. That notification must indicate the amount of

redress, if any, that any Corporate Defendant paid or is required to pay to consumers and

describe the consumers or classes of consumers to whom that redress has been or will be paid.

84.     Upon the transfer of funds pursuant to this Section, the Receivership will be dissolved.

## X.  Retention of Jurisdiction

**IT IS FURTHER ORDERED** that this Court will retain jurisdiction of this matter for

purposes of construction, modification, and enforcement of this Order.

## XI. Service

**IT IS FURTHER ORDERED** that this Order may be served upon Corporate Defendants

by certified mail or United Parcel Service, either by the United States Marshal, the Clerk of

Court, or any representative or agent of the Bureau.


**IT IS SO ORDERED**, on _____MAY 28_____, 2015.


_____
The Honorable James I. Cohn
United States District Judge

22